IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE GGP, INC. STOCKHOLDER LITIGATION | § § § § § § § § § § | No. 202, 2021<br><br>Court Below–Court of Chancery of the State of Delaware<br><br>C.A. No. 2018-0267 |

Submitted: March 9, 2022
Decided: July 19, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**.

Michael Hanrahan, Esquire (*argued*), Ronald A. Brown, Jr., Esquire, Stephen D. Dargitz, Esquire, J. Clayton Athey, Esquire, Marcus E. Montejo, Esquire, Samuel L. Closic, Esquire, PRICKETT JONES & ELLIOTT, P.A., Wilmington, Delaware; Carl L. Stine, Esquire, Adam J. Blander, Esquire, Antoinette Adesanya, Esquire, WOLF POPPER LLP, New York, New York; Brian D. Long, Esquire, LONG LAW, LLC, Wilmington, Delaware; Frank P. DiPrima, Esquire, LAW OFFICE OF FRANK DIPRIMA, P.A., Morristown, New Jersey, *for Plaintiffs-Below, Appellants*.

Kevin G. Abrams, Esquire, John M. Seaman, Esquire, Matthew L. Miller, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware; John A. Neuwirth, Esquire (*argued*), Evert J. Christensen, Jr., Esquire, Seth Goodchild, Esquire, Matthew S. Connors, Esquire, Nicole E. Prunetti, Esquire, WEIL, GOTSHAL & MANGES LLP, New York, New York, *for Defendant-Bellow, Appellee Brookfield Property Partners, L.P.*

Peter J. Walsh, Jr., Esquire, Berton W. Ashman, Jr., Esquire, Jaclyn C. Levy, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Peter E. Kazanoff, Esquire, Michael J. Garvey, Esquire, Sara A. Ricciardi, Esquire, SIMPSON THACHER & BARTLETT LLP, New York, New York, *for Defendants-*

*Below, Appellees Mary Lou Fiala, Janice R. Fukakusa, John K. Haley, and Christina M. Lofgren.*

Raymond J. Dicamillo, Esquire, Susan M. Hannigan, Esquire, RICHARDS, LAYTON & FINGER, Wilmington, Delaware; Brian T. Frawley, Esquire, Y. Carson Zhou, Esquire, SULLIVAN & CROMWELL LLP, New York, New York, *for Defendant-Below, Appellee Sandeep Mathrani.*

David J. Teklits, Esquire, Thomas P. Will, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *for Defendants-Below, Appellees Richard B. Clark, J. Bruce Flatt, and Brian W. Kingston.*

**TRAYNOR**, Justice, for the Majority:

In the negotiations leading up to a merger in which Brookfield Property Partners, L.P. and its affiliates acquired GGP, Inc., Brookfield evinced its concern over the number of GGP stockholders who might seek appraisal under 8 *Del. C.* § 262. Brookfield sought to allay this concern by including in the merger agreement an appraisal-rights closing condition that would allow it to terminate the transaction if a specified number of GGP shares demanded appraisal. But the special committee of GGP directors charged with negotiating the terms of the merger agreement held firm in opposition to this condition, and Brookfield relented. The condition was nixed.

The plaintiffs in this case, former GGP stockholders, allege that Brookfield and the directors of GGP decided to come at this problem from another angle. According to the stockholders, GGP's directors, urged on by Brookfield, structured the merger so that, as a practical matter, the GGP stockholders' appraisal rights were eviscerated. The plaintiffs say that Brookfield and the GGP directors accomplished their objective by dividing the consideration Brookfield would pay for GGP shares into a sizeable pre-closing dividend followed by a relatively small residual payment, the latter of which the merger proxy defined as the "per share merger consideration." GGP's directors then told their stockholders that they were "entitled to exercise their appraisal rights solely in connection with the merger," which occurred after the

3

declaration of the dividend, and that the appraised fair value of GGP—a company being sold for $23.50-per-share—"may be greater than, the same as or less than" the "per share merger consideration," valued at $0.312.

The GGP stockholders claim that, by divorcing the appraisal remedy from the large pre-closing dividend and linking it to the meager "per share merger consideration," Brookfield and the GGP directors led them to believe that a fair value determination in an appraisal proceeding would be limited to the value of post-dividend GGP. This description of appraisal rights, coupled with other descriptions of how the transaction was to be effected, led the stockholders, or so they have alleged, to believe that their appraisal rights had either been eliminated or so reduced as to be meaningless. And by agreeing to do this, they say, the GGP directors, with the aid of Brookfield, breached their fiduciary duties.

The stockholders filed suit in the Court of Chancery seeking quasi-appraisal damages, and the defendants—the GGP directors and Brookfield—moved to dismiss, contending that the stockholders' complaint failed to state a claim upon which relief could be granted. The Court of Chancery concluded that, because it could consider the pre-closing dividend as a "relevant factor" under the appraisal statute, the defendants' structuring of the merger did not deny the stockholders their right to seek appraisal.[1] The court, moreover, determined that, although the

---

[1] *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326 (May 25, 2021).

4

defendants' appraisal disclosures "could have been more clearly drafted,"[2] they were sufficient. The court therefore found that the plaintiffs' complaint failed to state a claim.

We agree with the Court of Chancery—though for different reasons—that, whether or not they may have intended to, the defendants did not, by paying a large portion of the merger consideration by way of a pre-closing dividend, structure the merger in a manner that effectively and unlawfully eliminated appraisal rights. We disagree, however, with the court's conclusion that the merger proxy's disclosures regarding appraisal were sufficient.

Although it is undisputed that the GGP directors notified stockholders that appraisal rights were available and complied with Section 262's notice requirements by including in the notice a copy of the statute, the manner in which the merger proxy described the merger and the stockholders' attendant appraisal rights was, at best, materially misleading. In our view, the disclosures, having described the merger and appraisal rights in a confusing manner, did not provide the stockholders the information they needed to decide whether to dissent and demand appraisal. And, as will be more fully developed below, it is reasonably conceivable to us that GGP's directors, aided and abetted by Brookfield, consciously crafted the transaction and the related disclosures in such a way as to deter GGP's stockholders

---

[2] *Id.* at *33.

from exercising their appraisal rights. Consequently, we have concluded that the Court of Chancery erred when it dismissed the plaintiffs' disclosure claim against the GGP directors and the stockholders' aiding-and-abetting claim against Brookfield.

## I

## A

GGP (or "the Company") was a real estate company and one of the largest owners and operators of shopping malls in the United States.[3] The Plaintiffs in this case are former GGP stockholders Randy Kosinski, Arthur Susman, and Robert Lowinger. The Defendants are Brookfield Property Partners ("Brookfield" or "BPY") as well as the members of GGP's Board of Directors and the Special Committee (the "Director Defendants") that approved the sale of GGP to Brookfield and disseminated the Definitive Proxy Statement (the "Proxy").[4]

---

[3] The facts are drawn from the well-pleaded allegations in the Plaintiffs' Third Amended Complaint as well as from documents integral to the Complaint or incorporated in it by reference, including the June 26, 2018 definitive proxy statement disseminated by GGP. We also draw on the Court of Chancery's 2021 opinion in this case and its review of the pertinent facts as pleaded. *In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326 (Del. Ch. May 25, 2021); *see also Kosinski v. GGP, Inc.*, 214 A.3d 944 (Del. Ch. 2019) (awarding Kosinski access to GGP's books and records under 8 *Del. C.* § 220).

[4] The operative complaint in this case names the following GGP directors as defendants: Richard B. Clark, Mary Lou Fiala, J. Bruce Flatt, Janice R. Fukakusa, John K. Haley, Daniel B. Hurwitz, Brian K. Kingston, Christina M. Lofgren, and Sandeep Mathrani. Compl. ¶¶ 27–38, App. to Answering Br. at B26–31. Clark, Flatt, Kingston, and Mathrani were GGP board members during the relevant period, and Fiala, Fukakusa, Haley, Hurwitz, and Lofgren served on the Special Committee. *Id.* Mathrani was also GGP's CEO. *Id.*

Before it was sold to Brookfield, GGP's properties included the Christiana Mall in Newark, Delaware, and other luxury malls throughout the country. GGP was organized as a tax-advantaged real estate investment trust ("REIT") that was publicly traded on the New York Stock Exchange. After the consummation of the sale at issue in this case (the "Transaction"), GGP was reconstituted and renamed Brookfield Property REIT Inc. ("BPR").[5] BPR is a publicly traded U.S.-registered REIT and is designed to mirror the economics of a BPY unit.[6]

Before the Transaction, GGP had counted Brookfield as a shareholder since at least 2010, when Brookfield made a multi-billion-dollar equity investment in the Company and helped it to emerge from bankruptcy. In exchange, Brookfield received the right to appoint three directors to the nine-member GGP Board. When merger negotiations began in 2017, Brookfield owned about 35 percent of GGP's voting stock.[7]

On May 1, 2017, GGP was trading at $23.07 per-share. On an investor conference call that day, GGP CEO Sandeep Mathrani shared his view that "there is a wide discount between public and private markets. The sum of the parts is far greater than GGP's current stock price."[8] Mathrani added that "we are reviewing all

---

[5] Compl. ¶ 206(f), App. to Answering Br. at B116.
[6] *Id.*
[7] *Id.* ¶ 136, App. to Answering Br. at B78.
[8] *Id.* ¶ 71, App. to Answering Br. at B42–43 (quoted emphasis removed).

strategic alternatives to bridge the gap" and "the disconnect has gotten so wide [that] it is up to us to demonstrate to the market that there's a real estate value at stake here."[9] In June 2017, Mathrani argued to the GGP Board that "[t]he Company is trading at a deep discount to its private market valuation"[10] and explained that "the current share price of $22.00 represents an approximately 20% discount to the mean [net asset value] per share estimate of Wall Street research analysts[.]"[11] Brookfield, at this time merely a major stockholder in GGP, appeared to share in Mathrani's optimism. On a November 2, 2017 investor call, Brookfield CFO Bryan Davis pegged GGP's net asset value at "about $30 per share."[12]

Nine days later, on November 11, Brookfield made an unsolicited offer to buy the rest of GGP it did not own, about 65 percent of the company (the "2017 Offer"). Under the 2017 Offer, each GGP share would be exchanged for, subject to proration, either (a) $23.00 in cash or (b) 0.9656 limited partnership units in the Bermuda-registered BPY.[13] The implied total offer value of the 2017 Offer was $13.8 billion.[14] On November 12, the GGP Board established a five-member Special Committee to negotiate with Brookfield.[15] After three weeks of internal discussions,

---

[9] *Id.* ¶ 71, 74, App to Answering Br. at B43.
[10] *Id.* ¶ 76, App. to Answering Br. at B44 (quoted emphasis removed).
[11] *Id.*
[12] *Id.* ¶ 78, App to Answering Br. at B46.
[13] *Id.* ¶ 137, App. to Answering Br. at B78.
[14] Proxy at 68, App. to Opening Br. at A96.
[15] Compl. ¶¶ 144–45, App. to Answering Br. at B83–85.

the Special Committee rejected the 2017 Offer, in part because of concern that many GGP stockholders would be restricted from, or otherwise not interested in, owning units of BPY, a Bermuda-registered partnership that was not organized as a REIT.[16]

During the next three months, the Special Committee negotiated for GGP shareholders to have the option to receive equity in a United States-registered REIT.[17] Brookfield agreed to this in February 2018—it eventually offered GGP stockholders equity in BPR, a newly formed U.S. REIT designed to mirror the economics of BPY—but the parties continued to negotiate other issues.[18] According to the Proxy, the Special Committee credited concerns from GGP management during this period that trends in the real estate market were growing less favorable.

Interested in either making progress with Brookfield or cutting off negotiations entirely, the Special Committee countered on February 24 at $24.00-per-share, a one dollar increase from Brookfield's previous offer. The Special Committee then requested Brookfield's "best and final" offer. Brookfield quickly responded with its final top-line offer (the "February 25 Offer"). According to the Proxy:

> The final proposal provided for consideration per share of GGP common stock, at the election of the unaffiliated

---

[16] Proxy at 63, App. to Opening Br. at A91; *see* Compl. ¶ 199, App. to Answering Br. at B113.

[17] Proxy at 63–68, App. to Opening Br. at A91–96.

[18] *Id.* The February 24 Offer included the option to receive, subject to proration, one share of class A stock in BRP REIT, "a newly created REIT that was expected to be listed on the NASDAQ upon closing[.]" Compl. ¶ 199, App. to Answering Br. at B113.

GGP common stockholders and subject to proration, of up to $23.50 in cash, subject to a maximum aggregate amount of cash to be paid of $9.25 billion, with the remainder of the consideration to consist of BPY units (or shares of class A stock) at an exchange ratio of 1:1.[19]

The February 25 Offer carried an implied value of $14.5 billion, up slightly from the $13.8 billion 2017 Offer.[20]

The Special Committee met with its advisers the next day and instructed them to begin negotiating definitive transaction documents in line with the February 25 offer. The Special Committee circulated a draft merger agreement on February 27.[21] Counsel for Brookfield responded with various proposed changes and, on March 7, a new draft agreement. The new draft featured a proposed structure with various steps—including "special dividends"—that were to occur over three days and culminate in the merger. It also included an "appraisal rights closing condition."[22]

Generally speaking, an appraisal-rights closing condition allows the purchaser to terminate the transaction if a specified number of shares demands appraisal.[23] Although the Proxy does not disclose the contours of Brookfield's demand or the

---

[19] *Id.* at 70, App. to Opening Br. at A98.
[20] *Id.*
[21] *Id.* at 71, App. to Opening Br. at A99.
[22] Proxy at 72, App. to Opening Br. at A100.
[23] *See, e.g.*, *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *5 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017); *see also* Charles Korsmo & Minor Myers, *Reforming Modern Appraisal Litigation*, 41 Del. J. Corp. L. 279, 327–28 (2017) ("[A]n acquirer that is worried about potential appraisal liability can quite easily address that liability directly by putting a closing condition in the merger agreement that allows the buyer to walk away in the event more than, say, 10% of the shares demand appraisal.").

threshold at which the appraisal-rights closing condition would have been triggered, it does disclose that the Special Committee actively fought the inclusion of such a condition. On March 10—three days after receiving Brookfield's latest draft agreement—the Special Committee requested "the deletion of the proposed appraisal rights closing condition[.]"[24] Undeterred, Brookfield on March 13 sent back a draft agreement proposing that "the closing would be subject to the previously proposed appraisal rights closing condition[.]"[25] In response, the Special Committee met to discuss five specified open issues, one of which was "the proposed appraisal rights closing condition[.]"[26] The Special Committee refused to budge on this point and, on March 19, "sent a revised draft of the merger agreement . . . , which did not reflect any material concessions on the material open issues."[27]

According to the Proxy, after the appraisal-rights closing condition failed to stick, the parties hammered out a small number of other open items. Negotiators cleared these issues during the week of March 19, and on March 26, the Special Committee met to consider the fairness of Brookfield's final proposal (the "Final Offer"), which offered stockholders $23.50 in cash or one unit of either BPY or the new BRP REIT, subject to proration, and did not contain an appraisal-rights closing

---

[24] Proxy at 73, App. to Opening Br. at A101.
[25] *Id.* at 74, App. to Opening Br. at A102.
[26] *Id.*
[27] Proxy at 76, App. to Opening Br. at A104; Compl. ¶ 304, App. to Answering Br. at B163.

condition.[28]  At this meeting, the Special Committee's financial adviser, Goldman Sachs, opined that

> the aggregate amount of the pre-closing dividend in the form of cash and shares of class A stock (or, at the election of GGP common stockholders, BPY units) and merger consideration to be paid to the GGP common stockholders (other than BPY and its affiliates) pursuant to the merger agreement was fair from a financial point of view to such holders.[29]

The Proxy does not describe any substantive negotiations between the Special Committee and Brookfield about the pre-closing dividend.  Instead, the "Background of the Transactions" section of the Proxy notes that Brookfield's 2017 Offer proposed "consideration per share of . . . $23.00,"[30] while the Final Offer was for "consideration per share of . . . up to $23.50 in cash[.]"[31]

Shortly after Goldman's presentation, and still on March 26, the Special Committee determined that Brookfield's offer was fair and formally recommended that the GGP Board support it.[32]  Immediately following the Special Committee's

---

[28] Compl. ¶¶ 166, 304, App. to Answering Br. at B97, B163; GGP common stockholders received "a combination of cash, representing 61% of the deal consideration, and either [a BPY unit or a BRP unit], representing the other 39%."  Compl. ¶ 167, App. to Answering Br. at B97. During the week of March 19, the parties heavily negotiated the right of GGP shareholders to exchange shares in BRP REIT for shares in BPY if they so desired after the close of the merger.  These negotiations are not directly relevant to this appeal.  *See* Proxy at 75–78, App. to Answering Br. at A103–106.

[29] *Id.* at 78, App. to Opening Br. at A106.

[30] *Id.* at 60, App. to Opening Br. at A88.

[31] *Id.* at 70, App. to Opening Br. at A98.  Both the 2017 Offer and the Final Offer proposed that GGP stockholders could also elect to receive equity compensation, subject to mandatory proration. Additionally, the Proxy notes that the final "blended offer price" was slightly lower than $23.50 after all required adjustments were made. *Id.*  This difference is not relevant to our analysis.

[32] *Id.* at 79, App. to Opening Br. at A107.

12

meeting and recommendation, GGP's Audit Committee and the GGP Board approved the Final Offer.[33] GGP and Brookfield executed the merger agreement on March 26, 2018.

B

The Transaction required approval by GGP's stockholders. Accordingly, Brookfield and GGP worked together to prepare the Proxy, which they filed on June 27, 2018.[34] The Proxy is 344 pages—not including the introductory letter, selected definitions, or the various exhibits—and is a deeply challenging read. It explained that, upon receipt of the required shareholder approvals, Brookfield would acquire GGP through a multi-step process headlined by a large pre-closing dividend (the "Pre-Closing Dividend").[35] The Pre-Closing Dividend would be funded by Brookfield[36] and become payable to all eligible stockholders after GGP adopted various charter amendments (the "Charter Amendments"), which facilitated the Transaction by, among other things, allowing GGP to issue new classes of equity.[37]

---

[33] *Id.*
[34] Compl. ¶ 3, App. to Answering Br. at B10; *GGP*, 2021 WL 2102326, at *2.
[35] Proxy at 56, App. to Opening Br. at A84. "Under the terms of the merger agreement, BPY will acquire GGP through a series of transactions including (i) the Brookfield affiliate exchange; (ii) the pre-closing dividend; (iii) the charter amendments; (iv) the bylaws amendments; (v) the partnership agreement amendment and restatement; (vi) the pre-closing transactions as BPY may request, including recapitalization or financing transactions; and (vii) the merger." *Id.*
[36] Proxy at iii, App. to Opening Br. at A19 ("'aggregate cash dividend amount' refers to the amount designated by BPY to GGP that constitutes the aggregate amount of cash that GGP will pay as the pre-closing dividend[.]"); *see also* Opening Br. at 19–20.
[37] Compl. ¶ 206(b), App. to Answering Br. at B115; Proxy at 56, App. to Opening Br. at A84.

13

The Pre-Closing Dividend was to be followed, the next day, by the closing of the

Transaction, which would trigger the right to the "per share merger consideration"

(the "Per-Share Merger Consideration").[38]  According to the Merger Agreement,

which was attached to the Proxy as Exhibit A, the Pre-Closing Dividend was an

automatic payment, while the Per-Share Merger Consideration would be paid only

upon surrender of certificates of share ownership to a payment agent.[39]

The Court of Chancery summarized the mechanics of the Transaction:

> [s]tructurally, the deal consideration would be paid in two
> parts: (1) a pre-closing dividend of cash and shares,
> amounting to about 98.5% of the deal consideration (the
> "Pre-Closing Dividend"), and (2) $0.312 per share in cash
> at closing, representing the balance of the deal

---

[38] App. to Opening Br. at A399–40; Ch. Dkt. No. 118, Ex. 17 at 2 [hereinafter "Aug. 24, 2018 BPR Form 8-K at _"] (reporting that the Transaction closed at 8:00 am on August 28, 2018, and that the Pre-Closing Dividend "became payable on August 27, 2018[.]" The form is dated August 24 because that was the date of the earliest event reported.); *accord* Ch. Dkt. No. 118, Ex. 8 at 1 (Brookfield press release announcing that "[i]t is expected that the payment date for the pre-closing dividend will be August 27, 2018, and that the closing of the transaction will occur on August 28, 2018, subject to customary closing conditions.").

[39] *Id.* at A408. ("[2](c) <u>Payment Procedures</u>. Promptly following the Pre-Closing Dividend Date . . . the Company or the Surviving Corporation . . . shall cause the Payment Agent to make payment to each holder of Company Shares that is entitled to receive the Pre-Closing Dividend. . . . Promptly following the Merger Effective Time . . . Parent and the Surviving Corporation shall cause the Payment Agent to mail to each holder of record . . . a certificate or certificates (the "Certificates") which immediately prior to the Merger Effective Time represented outstanding Company Shares . . . whose shares were converted into the right to receive the Merger Consideration . . . . Upon surrender of Certificates for cancellation to the Payment Agent . . . the holders of such Certificates shall be entitled to receive in exchange therefor an amount in cash equal to the product obtained by multiplying (x) the aggregate number of Company Shares represented by such Certificates . . . by (y) the Per Share Merger Consideration[.]"); *see also* Answering Br. at 15 ("Delaware law required GGP to pay the Pre-Closing Dividend to any GGP stockholders who demanded appraisal.  Indeed, it is black-letter law that directors may not discriminate among stockholders of the same class or series in the payment of a dividend[.]") (internal citations and quotation marks omitted).

consideration, capped at $200 million [the Per-Share Merger Consideration].[40]

These exact figures were not ascertainable from the Proxy. Instead, the Proxy used 161 words to define Per-Share Merger Consideration[41] and noted that the final amount of that payment would be determined after the effective time of the merger.[42] That said, stockholders who strung together the various defined terms and followed the Proxy's dense descriptions would have learned that the deal price was $23.50-per-share, that the Per-Share Merger Consideration would be tiny, and that the Pre-Closing Dividend would make up the lion's share of the consideration delivered in the merger—including more than $9 billion of the $9.25 billion in cash on offer.[43] In two hypotheticals included to illustrate the mechanics of the transaction, the Proxy

---

[40] *GGP*, 2021 WL 2102326, at *1; Compl. ¶ 4, App. to Answering Br. at B11.

[41] Proxy at vi, App. to Opening Br. at A22. "'per share merger consideration' refers to an amount of cash equal to the quotient of (i) $9,250,000,000 less (a) the aggregate cash payment required to be made pursuant to the GGPOP partnership agreement to holders of common units of GGPOP as a result of the Transactions at any time following the Brookfield affiliate exchange through and including the effective time of the merger, less (b) the aggregate cash payment required to be made pursuant to the GGPOP partnership agreement, to holders of the class of units designated under the GGPOP partnership agreement as "LTIP units," as a result of the Transactions at any time following the Brookfield affiliate exchange through and including the effective time of the merger, less (c) the aggregate cash consideration to be paid with respect to shares of GGP restricted stock as a result of the Transactions through and including the effective time of the merger and less (d) the aggregate cash dividend amount, divided by (ii) the merger share number[.]" *Id.*

[42] Proxy at 7–8, App. to Opening Br. at A35–6; Compl. ¶ 166, App. to Answering Br. at B97.

[43] By this, we mean that the Pre-Closing Dividend would constitute most—but not all—of the consideration delivered in the Transaction. We recognize, however, that in Aesop's fable "The Lion's Share," from which the idiom is derived, the king of the beasts, having gone a-hunting with a fox, a jackal, and a wolf, appropriated the *entire* spoil of the hunt, much to the chagrin of his fellows.

15

assumed that the Per-Share Merger Consideration would be $0.20 and the Pre-Closing Dividend would be $23.30.[44]

This distinction between the two types of consideration was central to the entire Proxy. While, in some places, the Proxy discussed the various steps of the sale collectively as "the Transactions," it defined the Per-Share Merger Consideration and Pre-Closing Dividend as completely separate from each other.[45] Keeping with this distinction, the Proxy defined "merger consideration" as "the per share merger consideration multiplied by the merger share number," *i.e.*, not including the Pre-Closing Dividend.[46] Likewise, the Proxy said that the "merger"—which it defined as "the merger of Goldfinch [the acquisition vehicle] with and into GGP, with GGP surviving the merger"[47]—would occur after the declaration of the Pre-Closing Dividend and the execution of the Charter Amendments.[48]

---

[44] Proxy at 7, App. to Opening Br. at A35.

[45] *Id.* at vi, App. to Opening Br. at A22. "'pre-closing dividend' refers to the special dividend declared by GGP, following receipt of the requisite stockholder approval at the special meeting, payable to the unaffiliated GGP common stockholders (not including holders of GGP restricted stock, but including certain holders of GGP options who are deemed stockholders), as of the record date of the pre-closing dividend, which is expected to be July 27, 2018, consisting of either cash or class A stock, at the election of such GGP common stockholders (with deemed stockholders being deemed to have elected cash) and subject to proration, with a payment date of the charter amendments closing[.]" *Id.*

[46] *Id.*

[47] *Id.*; *id.* at 56, App. to Opening Br. at A84 ("At the effective time of the merger, Goldfinch will merge with and into GGP, with GGP surviving the merger.").

[48] *Id.* at 56, App. to Opening Br. at A84. The Merger Agreement, attached to the Proxy as Exhibit A, explained that the Merger Closing Date would be "the first (1st) Business Day following the Charter Closing Date." App to Opening Br. at A399–40. The Charter Closing Date was also the payment date of the Pre-Closing Dividend. *Id.* The Complaint alleges that these steps, along with

The distinction between types of consideration was also prominent in the Proxy's discussion of appraisal rights, which is central to this appeal. In a section entitled "Appraisal Rights in the Merger," the Proxy explained that:

> If the Transactions are completed, GGP common stockholders who comply exactly with the applicable requirements and procedures of Section 262 of the DGCL will be entitled to demand appraisal of their GGP common stock and receive in lieu of the per share merger consideration a cash payment equal to the "fair value" of their GGP common stock, as determined by the Court of Chancery, in accordance with Section 262 of the DGCL, plus interest, if any, on the amount determined to be the fair value, subject to the provisions of Section 262 of the DGCL. Such appraised value may be greater than, the same as or less than the per share merger consideration.[49]

This opinion refers to the above-quoted text, together with the entire "Appraisal Rights in the Merger" section appearing at pages 335–39 of the Proxy, as the "Appraisal Rights Notice."

Again, the Per-Share Merger Consideration—ultimately valued at 31 cents—was a tiny portion of the overall deal price. It would become payable immediately following the completion of the sale process's final step, which the Proxy referred to as the "merger."[50] This was all distinct from the Pre-Closing Dividend, which

_____

the other elements of the Transaction, occurred "virtually simultaneously between Monday, August 27, 2018, after securities markets closed, and August 28, 2018, before markets opened[.]" Compl. ¶ 206, App. to Answering Br. at B115.

[49] Proxy at 335, App. to Opening Br. at A384.

[50] *Id.* at 56, App. to Opening Br. at A363.

17

was worth about 98.5 percent of the consideration and would become payable the day before the closing.[51]

The Appraisal Rights Notice—and its guidance that the fair value of each share of GGP, a multi-billion-dollar company being sold for $23.50-per-share, "may be greater than, the same as or less than" 31 cents—was not a scrivener's error or a one off. Elsewhere, the Proxy reiterated to stockholders that they were "entitled to exercise appraisal rights solely in connection with the merger."[52] The Proxy's introductory letter said the same thing.[53] And an election form, which was distributed after the stockholder vote had succeeded and the appraisal deadline had passed, directed stockholders to review the Proxy and stated that "[a]ppraisal is only available with respect to the Merger Consideration."[54] Each of these notices was consistent with the manner in which the Proxy and its exhibits described the closing process, which was that the Pre-Closing Dividend would become payable before the

---

[51] *Id.*; *see* App. to Opening Br. at A399–40.

[52] Proxy at 15, App. to Opening Br. at A43.

[53] App. to Opening Br. at A13 ("As discussed in the attached joint proxy statement/prospectus, GGP common stockholders are entitled to appraisal rights solely in connection with the merger.").

[54] Ch. Dkt. 127, Ex. C at 6; *see GGP*, 2021 WL 2102326, at *32. We agree with the Court of Chancery's observation that the election form "could not have misled any stockholder into foregoing appraisal because it was disseminated *after* the stockholder vote when the time to seek appraisal had expired." *Id.* (emphasis in original). Even so, the election form presents an instructive example of how the Company viewed—and described—the Transaction. GGP concedes that "the Election Form . . . was consistent with the Proxy." Answering Br. at 31.

"merger," with the separately defined Per-Share Merger Consideration becoming payable upon closing.[55]

Notably, in its detailed reasons for recommending the approval of the Final Offer, the Special Committee appeared to take a different view of appraisal rights than the rest of the Proxy. The Special Committee told stockholders that counting in favor of approval was

> the availability of appraisal rights under Delaware law . . . which provides those eligible GGP common stockholders with an opportunity to have the Court of Chancery determine the fair value of their shares of GGP common stock, *which may be more than, less than, or the same as the consideration to be received in the Transactions*[.][56]

Thus, while the Appraisal Rights Notice told stockholders that GGP's fair value would be "greater than, the same as or less than" 31 cents, the Special Committee's reasons for approving the Final Offer included that the fair value would be "greater than, the same as or less than the consideration to be received in the Transactions," which was $23.50.

---

[55] *See* Proxy at 56, App. to Opening Br. at 84.
[56] Proxy at 86, A114 (emphasis added).

C

1

Ninety-four percent of stockholders unaffiliated with Brookfield approved the Transaction on July 26, 2018.[57]  On August 27, the Pre-Closing Dividend became payable by GGP with Brookfield's funds.[58]  On August 28, the Transaction closed, and the Per-Share Merger Consideration became payable.[59]  The Plaintiffs allege that GGP stockholders received both payments together in the same wire or check.[60]

The Plaintiffs filed their original Complaint in April 2018, shortly after the Transaction—then just a merger agreement subject to ratification—was announced.[61]  They filed their operative Third Amended Complaint, which this decision refers to as the Complaint, in May 2020.[62]  During the intervening period, Plaintiff Randy Kosinski "sought books and records under Section 220 of the Delaware General Corporation Law to investigate possible wrongdoing in connection with the merger."[63]  The Court of Chancery described Kosinski as "the quintessential main street investor," found that he had stated a credible basis and proper purpose for his investigation, and ordered GGP to produce records essential

---

[57] *GGP*, 2021 WL 2102326, at *2; Compl. ¶ 229, App. to Answering Br. at B129.
[58] Compl. ¶ 206, App. to Answering Br. at B115; Proxy at iii, App. to Opening Br. at A19; *see also* Opening Br. at 19–20.
[59] Compl. ¶ 206, App. to Answering Br. at B115; Aug. 24, 2018 BPR Form 8-K at 2.
[60] Compl, ¶ 207, App. to Answering Br. at B117–18.
[61] Ch. Dkt. No. 1.
[62] Ch. Dkt. No. 109.
[63] *Kosinski*, 214 A.3d at 946–47.

to his inspection demand.[64]  GGP eventually "produced documents including Board and Special Committee meeting minutes and materials, director questionnaires, as well as emails."[65]

The Plaintiffs' Complaint draws on certain of those books and records, as well as the public Proxy.  It alleges six causes of action.  The Court of Chancery dismissed each count, and on appeal the Plaintiffs press only two.  Count III asserts that the Defendants designed the large Pre-Closing Dividend to improperly eviscerate GGP stockholders' appraisal rights.[66]  Count III also alleges that the Defendants "breached their fiduciary duty of loyalty by failing to provide GGP stockholders with a fair summary of their appraisal rights and [not] disclosing all material information relevant to GGP stockholders asked to vote in favor of the Buyout or pursue appraisal."[67]

Count VI alleges that Brookfield aided and abetted the Director Defendants' fiduciary breaches because it helped design the Transaction and "co-authored, co-filed, and disseminated the misleading and deficient Proxy to GGP's stockholders."[68]  Count VI is relevant on appeal because the Court of Chancery

---

[64] *Id.* at 957–58.

[65] *GGP*, 2021 WL 2102326, at *10.

[66] Compl. ¶ 305, App. to Answering Br. at B163.

[67] *Id.* ¶ 303, App. to Answering Br. at B163.  The Complaint also alleges that the Defendants had "a statutory duty to provide a fair summary of appraisal rights," presumably referring to 8 *Del. C.* § 262(d)(1).  Compl. ¶ 232, App. to Answering Br. at B130.

[68] *Id.* ¶ 329, App. to Answering Br. at B168.  *GGP*, 2021 WL 2102326, at *35.

21

found that Brookfield was not a controller and therefore did not owe fiduciary duties to GGP's stockholders.  That said, "it is well settled that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship."[69]

Key to the Plaintiffs' disclosure claim is their allegation that "Defendants' misleading statements and omissions . . . would have dissuaded any rational stockholder from seeking appraisal."[70] The Plaintiffs also assert that, by telling stockholders that the fair value of GGP would be "greater than, the same as or less than" the Per-Share Merger Consideration of 31 cents, the Appraisal Rights Notice erroneously gave the impression that a dissenter would "only place[] a *de minimis* part of GGP's supposed pre-Buyout value at issue."[71]  According to the Complaint:

> Defendants' conduct was intentional, a contrived scheme
> to dissuade Class members from exercising appraisal

---

[69] *Malpiede v. Townson*, 780 A.2d 1075, 1096 & n.75 (Del. 2001) (quoting *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. 1984)); *see also Jackson v. Smith*, 254 U.S. 586, 589 (1921) (holding that those "who knowingly join a fiduciary" in an enterprise which constitutes a breach of fiduciary duty "become jointly and severally liable with him for such profits.").

[70] Compl. ¶ 209, App. to Answering Br. at B118–19.

[71] *Id.* ¶ 225–26, App. to Answering Br. at B128; *see also* App. to Opening Br. at A900 ("'What truly occurred' is that Defendants structured the transaction such that an economically rational stockholder would never opt for appraisal rights.  Further, 'what truly occurred' is that stockholders were denied the right to appraisal for all but a *de minimis* portion of the value of their shares.") (emphasis removed)); *see also Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1224 (Del. 2021) ("Section 262(g) provides a *de minimis* exception from appraisal rights for stockholders of publicly-traded corporations."); *and see id.* at 1250 n.94 (Valihura, J., dissenting) ("The Majority cites the *de minimis* exception from appraisal rights for stockholders of public-traded corporations. . . . The amendment to Section 262(g) was designed to address the concern that certain potential appraisal petitioners were targeting corporations and demanding settlements to address threatened appraisal claims, even non-meritorious claims. Some referred to this phenomenon as 'appraisal arbitrage.'").

rights that BPY was actively trying to limit in negotiations with the Special Committee. While the Special Committee rejected the appraisal right condition BPY sought in the Buyout, Defendants were nonetheless successful in presenting GGP stockholders with an option no reasonable stockholder would accept – pursue the appraisal for only 1.5% of the consideration put in controversy by the Buyout.[72]

As a remedy for the Defendants' alleged breaches of the duty of loyalty, the Complaint requests quasi-appraisal damages.[73]

2

After oral argument, the Court of Chancery ordered supplemental briefing on Count III, asking the parties to address three questions.[74] First, the court inquired as to whether the Transaction's structure violated Section 262 by stripping most of GGP's value out via the Pre-Closing Dividend shortly before the merger.[75] Second, it requested that the parties specify, based on the structure of the Transaction, "what specifically was a GGP stockholder entitled to have the Court appraise[.]"[76] Third, the court asked if the definitions of Per-Share Merger Consideration, Pre-Closing Dividend, and "merger consideration" were materially misleading. The parties

---

[72] Compl. ¶ 304, App. to Answering Br. at B163; *see also id.* ¶¶ 209–234.
[73] *Id.* ¶ 307, App. to Answering Br. at B164.
[74] Ch. Dkt. No. 143.
[75] *Id.* at 4.
[76] *Id.* at 4–5.

submitted supplemental briefing in response to these questions on February 18, 2021.[77]

In an opinion issued on May 25, 2021, the Court of Chancery found that the Plaintiffs had failed to state a non-exculpated claim against the Defendants. As to Count III, the court first determined that the Pre-Closing Dividend did not unlawfully deprive stockholders of their appraisal rights because, in a hypothetical appraisal, the Court of Chancery would have had the "flexibility" to consider the Pre-Closing Dividend as a "relevant factor" and adjust its fair-value determination accordingly.[78] Second, the court determined that, although "the Proxy could have been more clearly drafted" and "the stockholders may have been better served had Defendants capitalized the defined term 'merger consideration' and tightened up its definition," the Complaint failed to allege an actionable disclosure violation.[79] According to the court, the Proxy adequately disclosed that stockholders had the "right to an appraisal of their shares" and was not required to entertain hypotheticals presented by the Transaction's structure.[80]

---

[77] Ch. Dkt. Nos. 146–47.
[78] *GGP*, 2021 WL 2102326, at *31.
[79] *Id.* at *33.
[80] *Id.* at *32.

## II

The Plaintiffs have appealed the Court of Chancery's dismissal of the Complaint.[81] We review a trial court's ruling on a motion to dismiss *de novo*.[82] We "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) do not affirm a dismissal unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[83] Naturally, our review recognizes that stockholder plaintiffs often have the ability under Section 220 to obtain corporate documents in support of their claims, as the Plaintiffs did here.[84] These documents, and other public materials that the Plaintiffs refer to, like the Proxy, necessarily shape the range of "reasonably conceivable" outcomes.

---

[81] Sup. Ct. Dkt. No. 1.

[82] *Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[83] *Id.* (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[84] *AmerisourceBergen Corp. v. Lebanon Cnty. Employees' Ret. Fund*, 243 A.3d 417, 426 n.33 (Del. 2020) (quoting *Ca. State Teachers' Ret. Sys. v. Alvarez*, 179 A.3d 824, 839 (Del. 2018)); *see also* Lawrence A. Hamermesh & Michael L. Wachter, *The Importance of Being Dismissive: The Efficiency Role of Pleading Stage Evaluation of Shareholder Litigation*, 42 J. Corp. L. 603 (2017) (observing that "Delaware's system affirmatively encourages reliance on factually specific pleadings as a basis for substantive evaluation of shareholder litigation at an early stage of the proceedings" and that "the Delaware system provides or depends on mechanisms that enable and encourage the plaintiff and the defendants as well to supply relevant information that meaningfully assists the courts in improving the fairness and utility of that substantive, pleading stage evaluation.").

## III

The threshold question in this appeal is whether the Transaction's use of the Pre-Closing Dividend to shift consideration from the purchaser, Brookfield, to GGP's stockholders violated Delaware law by improperly restricting or eliminating appraisal rights.[85] We conclude that it did not. In Part III.A, we offer a brief history of the appraisal remedy in Delaware as well as a description of the remedy's characteristics as relevant here. In Part III.B, we hold that dividends that are conditioned on the consummation of a merger are treated as merger consideration under Delaware law, meaning that the fair value of an entity that declares a conditional dividend—such as the Pre-Closing Dividend—is appraised as if the dividend had not been declared. In Part III.C, we hold that receiving a conditional dividend that is merger consideration as a matter of law does not result in the abandonment of a stockholder's appraisal right. This is because Section 262 does not prohibit the receipt of dividends payable before the effective date of the merger, and our settled prohibition of the "acceptance" of merger consideration does not apply to the choiceless receipt of a mandatory payment such as the Pre-Closing Dividend. After explaining these conclusions about how GGP would have been appraised, we turn in Part IV to the Plaintiffs' claim that GGP's directors violated their fiduciary duty of disclosure.

---

[85] Opening Br. at 15–31.

A

Before the Delaware appraisal statute, now located at 8 *Del. C.* § 262, was enacted in 1899, a consolidation or merger of corporations required unanimous stockholder approval.[86] This effectively gave individual stockholders a veto right over any transaction with which they disagreed. This form of minority protection led to nuisance blocking, threatening stockholder democracy.[87] To curb nuisance blocking, the Delaware General Assembly enacted statutes that "permit[ted] the consolidation or merger of two or more corporations without the consent of all the stockholders. . . ."[88] At the same time, the General Assembly protected dissenting minority stockholders by creating appraisal rights.[89] In an appraisal proceeding, the stockholder receives her *pro rata* share of the fair value of the appraised company— as calculated by the Court of Chancery—instead of accepting the consideration offered in the approved transaction. "Accordingly, the Court of Chancery's task in an appraisal proceeding is to value what has been taken from the shareholder, *i.e.*, the proportionate interest in the going concern."[90]

---

[86] *Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1133 (Del. 2020) (citing *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 19)).

[87] *Schenley Indus., Inc. v. Curtis*, 152 A.2d 300, 301 (Del. 1956) ("This, at times, brought about an intolerable situation, since one or more minority stockholders, if he or they desired to do so, could impede the action of all the other stockholders.").

[88] *Id.*

[89] *Id.*

[90] *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 298 (Del. 1996) ("Technicolor IV").

Section 262 is implicated when the terms of a merger or consolidation require stockholders "to accept any consideration other than shares of stock in the surviving company, shares of stock listed on a national securities exchange [or held of record by more than 2,000 holders], [] cash received as payment for fractional shares,"[91] or any combination of shares of stock and cash received for fractional shares.[92]  Here, GGP stockholders received a combination of cash, representing 61 percent of the consideration delivered in the Transaction, and equity in one of two entities, representing the remaining 39 percent.[93]   All parties agree that this structure triggered Section 262, allowing dissenting stockholders to seek a judicial appraisal of the fair value of their stock.

To perfect appraisal rights, stockholders must strictly comply with the requirements of Section 262.  Section 262(a) provides that the right to seek appraisal extends only to each stockholder who (1) "holds shares of stock on the date of the making of a demand" for appraisal, (2) "continuously holds such shares through the effective date of the merger," and (3) "has neither voted in favor of the merger . . . nor consented thereto in writing[.]"   Section 262 does not explicitly forbid dissenting stockholders from receiving merger consideration, but the general rule is

---

[91] *La. Mun. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1191 (Del. Ch. 2007) (*citing* 8 Del. C. § 262).
[92] 8 *Del. C.* § 262(b).
[93] Compl. ¶ 167, App. to Answering Br. at B97.

28

that "[a]cceptance of the merger consideration is simply an abandonment of the appraisal right, no more and no less, at least in the usual case."[94]

When determining the fair value of a dissenting stockholder's shares under Section 262, the Court of Chancery must "take into account all relevant factors," which include "market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation[.]"[95] The court calculates a per-share valuation by first "envisag[ing] the entire pre-merger company as a 'going concern.'"[96] "'[T]he corporation must be viewed as an on-going enterprise, occupying a particular market position in the light of future prospects."[97] "The valuation should reflect the '"operative reality" of the company as of the time of the merger,'" but it should not consider a minority discount or any synergies or value arising from the merger.[98]

---

[94] *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *22 (Del. Ch. Aug. 18, 2006) (Strine, VC).

[95] *Tri-Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950).

[96] *Dell*, 177 A.3d at 20.

[97] *Id.*; *see also* William T. Allen & Reiner Kraakman, *Commentaries and Cases on the Law of Business Organizations* 492 (2016) ("The appraisal right is a put option—an opportunity to sell shares back to the firm at a price equal to their 'fair value' immediately prior to the transaction triggering the right. Thus, there are two dimensions to appraisals: (1) the definition of the shareholder's claim (*i.e.*, what it is specifically that the court is supposed to value) and (2) the technique for determining the value.").

[98] *Dell*, 177 A.3d at 20. Section 262(h) directs the court to "determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation." We have described this as a "very narrow" exclusion. *Technicolor IV*, 684 A.2d at 299 ("The 'accomplishment or expectation' of the merger exception in Section 262 is very

Section 262 also places strict compliance requirements on corporations. Within certain time periods outlined in the statute, corporations must notify stockholders of record of their right to seek appraisal and attach a copy of Section 262 to that notice.[99] Additionally, when disclosing appraisal rights to stockholders, corporate directors must provide all material information necessary to make an informed decision to either approve the merger or dissent and seek appraisal.[100] If the directors provide notice that violates the fiduciary duty of disclosure, stockholders may, subject to affirmative defenses and exculpation under Section 102(b)(7), be entitled to a "quasi-appraisal," a term this Court coined in *Weinberger v. UOP*.[101]

As we explained in *Berger v. Pubco Corp*., in a quasi-appraisal, the Court of Chancery determines the fair value of the corporation and, if it exceeds the deal price, awards the balance as damages to an opt-out class of the former corporation's

---

narrow, 'designed to eliminate use of pro forma data and projections of a speculative variety relating to the completion of a merger.' *Weinberger v. UOP, Inc.*, 457 A.2d [701, 713 (Del. 1983).] That narrow exclusion does not encompass known elements of value, including those which exist on the date of the merger because of a majority acquiror's interim action in a two-step cash-out transaction.").

[99] 8 *Del. C.* § 262(d)(1).

[100] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000); *Nagy v. Bistricer*, 770 A.2d 43, 59 (Del. Ch. 2000); *Turner v. Bernstein*, 776 A.2d 530, 541-52 (Del. Ch. 2000) (*Turner I*); *see also In re Orchard Enters., Inc. S'Holder Litig.*, 88 A.3d 1, 47 (Del. Ch. 2014) (Laster, VC) ("The fiduciaries who serve the entity owe fiduciary duties; the entity that is served does not.") (citing *A.W. Fin. Servs., S.A. v. Empire Resources, Inc.*, 981 A.2d 1114, 1127 n.36 (Del. 2009)).

[101] *Weinberger v. UOP*, 457 A.2d 701, 714–15 (Del. 1983) (granting plaintiff stockholder a "quasi-appraisal remedy" after buyer-affiliated directors of target failed to disclose internal valuation of target that was significantly higher than the approved deal price).

stockholders.[102]  *Berger* concerned a "short-form" merger under 8 *Del. C.* § 253, but decisions issued before and after *Berger* support the application of the quasi-appraisal remedy to other mergers as well.[103]  Indeed, "[o]ne cause of action where the Delaware Supreme Court and the Court of Chancery consistently have held that quasi-appraisal damages are available is when a fiduciary breaches its duty of disclosure in connection with a transaction that requires a stockholder vote."[104]  The Plaintiffs in this case allege that GGP's directors violated their disclosure duties and seek quasi-appraisal as a remedy.  GGP argues that no fiduciary violation occurred but does not contest the availability of quasi-appraisal as a remedy.

To summarize, Delaware law requires the Court of Chancery, when conducting an appraisal, to determine the value of the corporation at the time of the

---

[102] *Berger v. Pubco Corp*., 976 A.2d 132, 138–45 (Del. 2009).

[103] *Orchard Enters*, 88 A.3d at 47 ("As these decisions show, quasi-appraisal damages are one possible remedy for breaches of the duty of disclosure, and the availability of the quasi-appraisal damages measure is not limited to short-form mergers.").  In *Orchard Enterprises*, Vice Chancellor Laster exhaustively surveyed the development of quasi-appraisal, which he dated back to our decision in *Weinberger*.  *Id.* at 42–43.  He explained that the term "'[q]uasi-appraisal' is simply a short-hand description of a measure of damages" that, like other types of compensatory damages, is "measured by the harm inflicted on the plaintiff at the time of the wrong."  *Id.* at 42. *See also Weinberger*, 457 A.2d at 714–15; *Turner v. Bernstein*, 768 A.2d 24, 28–9 (Del. 2000) (Strine, VC) (*Tuner II*) (holding that quasi-appraisal was available after third-party merger where directors "breached their fiduciary duties by failing to disclose all the material facts that [] stockholders needed to determine whether to accept the merger consideration or seek appraisal[.]"); *and see PNB Holding Co.*, 2006 WL 2403999, at \*32 (ordering a "quasi-appraisal award" of damages to estate that suffered from former executor's "failure as a fiduciary" that caused estate to fail to perfect appraisal rights.).

[104] *Orchard Enters.*, 88 A.3d at 42.  "The premise for the award is that without the disclosure of false or misleading information, or the failure to disclose material information, stockholders could have voted down the transaction and retained their proportionate share of the equity in the corporation as a going concern. Quasi-appraisal damages serve as a monetary substitute for the proportionate share of the equity that the stockholders otherwise would have retained."  *Id.*

merger as if it had not occurred and the company had continued as a going concern.[105] Once this fair value is determined, each petitioner is entitled to his *pro rata* portion of the appraised company's value, plus interest.[106] And, although stockholders must comply exactly with Section 262 to secure the appraisal remedy, they may be entitled to a quasi-appraisal if they can show that the corporation's directors violated their fiduciary duty of disclosure when they sought stockholder approval of the deal.

B

Our review of Delaware appraisal law frames the question of how an appraisal proceeding conducted under Section 262 would consider a transaction, such as the one at issue here, that utilizes a large dividend to transfer consideration to stockholders shortly before closing. The Defendants have argued throughout this case that the answer is uncertain and that they left stockholders to figure out how an appraisal would view the Transaction GGP and Brookfield designed.[107] Repeatedly noting that they advised GGP's stockholders to retain lawyers to help them navigate

---

[105] *Technicolor IV*, 684 A.2d at 298; *see also Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000) ("The underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred.").

[106] *See* 8 *Del. C.* § 262(h).

[107] Answering Br. at 29 ("Plaintiffs' contention that GGP should have disclosed its subjective views on how the Court of Chancery would treat the dividend in determining 'fair value' is simply not the law.").

the appraisal process,[108] the Defendants explain that a dissenter "would have been free to make any argument and submit any evidence she (and her experts) wished as to how the court should treat the Pre-Closing Dividend."[109] The Court of Chancery agreed, holding that the Pre-Closing Dividend was a "relevant factor" that the appraising court could—or could not—consider under Section 262(h).[110]

The Plaintiffs argue that the Pre-Closing Dividend was "part of the Merger," such that any appraisal proceeding would have measured GGP's value before the payment was made.[111] They observe that the Pre-Closing Dividend was detailed in the section of the Merger Agreement entitled "THE MERGER," that it was dependent on stockholder approval of the Transaction, and that it was paid with Brookfield's funds in the same check or wire as the Per-Share Merger Consideration.[112] The significance of labeling the Pre-Closing Dividend as legal merger consideration—"part of the Merger"—is, according to the Plaintiffs, this:

---

[108] *Id.* at 3, 26–30.

[109] *Id.* at 16. The Defendants also acknowledged that they might well have fought to limit any appraisal action to valuing GGP after payment of the Pre-Closing Dividend. As Counsel for GGP explained:
> "You're accepting [the Pre-Closing Dividend], to the extent that was merger consideration, but you're not accepting the $0.312, and that's the part that you're forfeiting, and then you can go into court and you can say to the judge whatever you want, you can say 'you should take into account both the dividend and the $0.312 in valuing my shares,' [or] 'you should only take into account the $0.312,' perhaps a defendant would say. Anything could be argued in the appraisal court."

March 9, 2022 Oral Argument at 38:00–39:00, *In re GGP, Inc. S'holder Litig.* (No. 202, 2021) https://livestream.com/accounts/5969852/events/10198573/videos/229793264.

[110] *GGP*, 2021 WL 2102326, at *31.

[111] Opening Br. at 6, 17.

[112] *Id.* at 18–20; Compl, ¶ 207, App. to Answering Br. at B117–18.

"[i]f the Dividend was part of the Merger, then the fair value determination would be based on GGP as it stood pre-Dividend but if, as the Proxy said, the Dividend was separate from the Merger, then fair value would be determined post-Dividend."[113]

We agree with the Plaintiffs: the Pre-Closing Dividend was, as a matter of Delaware law, merger consideration in the Transaction, just like the Per-Share Merger Consideration. The Defendants' careful efforts to divide the deal price into two payments—while no doubt confusing to the stockholders who attempted to read the Proxy—do not change the object of the Court of Chancery's appraisal. That is to say, the court would have been required to determine the fair value of GGP as an entity before both payments were made.

Although the Transaction hardly exhibits a common structure, its use of a large conditional dividend is similar to the merger Chancellor Chandler considered in *Louisiana Municipal Police Employees Retirement System v. Crawford*.[114] *Crawford* dealt with a stock-for-stock merger of equals between Caremark and CVS.[115] After Express Scripts made an unsolicited offer to acquire Caremark, CVS sweetened its offer by agreeing to a conditional dividend of $6-per-share.[116] Caremark and CVS then scheduled a stockholders' meeting for the approval of the

---

[113] Reply Br. at 2; Opening Br. at 6, 22–23.
[114] *Crawford*, 918 A.2d at 1179.
[115] *Id.*
[116] *Id.* at 1182–83.

merger, but certain Caremark stockholders sued to enjoin the meeting because the disclosures did not inform stockholders of their appraisal rights.[117] Caremark and CVS responded that the dividend had "independent legal significance preventing it from being recognized as merger consideration."[118] Thus, they argued, the merger did not trigger appraisal rights.[119]

The Court of Chancery rejected that argument and determined that the conditional dividend was, as matter of law, merger consideration.[120] The court elaborated that the dividend was "simply cash consideration dressed up in a none-too-convincing disguise."[121] The court reached this conclusion because the dividend was being paid to Caremark stockholders on behalf of CVS and was conditioned on the approval of the merger.[122] The Chancellor therefore held that payment of the cash dividend as part of the merger consideration triggered the stockholders' appraisal rights under Section 262(b).[123]

The Defendants argue that *Crawford* is not applicable here because it held only that conditional dividends trigger appraisal rights, not that conditional

---

[117] *Id.* at 1183–84, 1192.
[118] *Id.* at 1191.
[119] *Id.*
[120] *Id.* at 1192 ("In this case, the label 'special dividend' is simply cash consideration dressed up in a none-too-convincing disguise. When merger consideration includes partial cash and stock payments, shareholders are entitled to appraisal rights.").
[121] *Id.*
[122] *Id.* at 1191.
[123] *Id.* at 1192.

dividends are part of the merger consideration for purposes of an appraisal action.[124] Thus, the Defendants contend that, to the extent *Crawford* is relevant, they satisfied it by disclosing in the Proxy that GGP stockholders had the right to seek appraisal of their shares.[125] But the obvious application of *Crawford*'s holding is that the Pre-Closing Dividend is merger consideration not only for the purpose of triggering appraisal rights but also for the purpose of framing the scope of the appraisal proceeding under Section 262. Because such proceedings determine the value of the corporation at the time of the merger as if it had not occurred, dividends expressly conditioned on the merger—like all other merger consideration—must be treated as if they had not been paid.

We therefore hold that the Pre-Closing Dividend was, as a matter of Delaware law, merger consideration in the Transaction. This is because it was conditioned on the Transaction's approval and, according to the Complaint, paid with Brookfield's funds in the same wire as the Per-Share Merger Consideration. Thus, a properly conducted appraisal of GGP would have valued the Company as if the Pre-Closing Dividend and Per-Share Merger Consideration had not been paid.

---

[124] Answering Br. at 18–19.
[125] *Id.* at 19.

## C

Because we have held that the Pre-Closing Dividend was merger consideration under Delaware law, we must now decide whether each GGP stockholder's receipt of this payment effected a forfeiture of the right to seek appraisal. If the Transaction operated in this way, we must also determine if it was consistent with our law.[126] Writing as Vice Chancellor, former Chief Justice Strine explained the general rule: "Acceptance of the merger consideration is simply an abandonment of the appraisal right, no more and no less, at least in the usual case."[127] But this is not the general or usual case. The Transaction designed by Brookfield and the Director Defendants featured the large Pre-Closing Dividend, which was worth 98.5 percent of the deal price and automatically became payable the day before closing, and the tiny Per-Share Merger Consideration, which was worth 1.5 percent of the offer and became payable upon closing.[128] In our view, receipt of the Pre-Closing Dividend did not effect a waiver of appraisal rights.

We start our analysis with the text of Section 262.[129] Delaware's appraisal statute does not contain a specific textual prohibition against receiving consideration

---

[126] Opening Br. at 15–33.

[127] *PNB Holding*, 2006 WL 2403999, at *22.

[128] *See* Aug. 24, 2018 BPR Form 8-K at 2 (reporting that the Transaction closed at 8:00 am on August 28, 2018, and that the Pre-Closing Dividend "became payable on August 27, 2018[.]").

[129] *Noranda Aluminum Holding Co. v. XL Insur. Am., Inc.*, 269 A.3d 974, 977–78 (Del. 2021) ("When interpreting a statute, our goal is 'to ascertain and give effect to the intent of the legislators, as expressed in the statute.'") (quoting *Dewey Beach Enters., Inc. v. Bd. of Adjustment of Town of Dewey Beach*, 1 A.3d 305, 307 (Del. 2010)).

offered in a merger. Instead, Section 262(a) provides that appraisal is only available to the stockholder, otherwise eligible, who "has neither voted in favor of the merger . . . nor consented thereto in writing[.]"[130] Receipt of the Pre-Closing Dividend does not offend this prohibition because it was payable to supporting and dissenting GGP stockholders alike the day before the Transaction closed.[131]

Nor does the Pre-Closing Dividend contravene Section 262(k). According to that subsection, dissenting stockholders may not "receive payment of dividends or other distributions on the stock (*except dividends or other distributions payable to stockholders of record at a date which is prior to the effective date of the merger or consolidation*)[.]"[132] Thus, Section 262 creates an express exception allowing stockholders to receive dividends payable before the "effective date of the merger." Here, that day was August 28, 2018, and the Pre-Closing Dividend became payable on August 27.[133]

---

[130] 8 *Del. C.* § 262(a); *see also id.* § 262(d)(1) ("Within 10 days after the effective date of such merger or consolidation, the surviving or resulting corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and *has not voted in favor of or consented to the merger* or consolidation of the date that the merger or consolidation has become effective[.]") (emphasis added).

[131] Aug. 24, 2018 BPR Form 8-K at 2; App. to Opening Br. at A399 ("The Company shall declare a special dividend payable to the holders of record of Company Shares (other than to holders of Company Restricted Stock, but including to each holder of an In-the-Money Company Option, with respect to the number of Company Shares that are deemed issued in respect of such Company Option under Section 2.07(d)(i)) as of the end of trading on the NYSE on the Charter Closing Date, with a payment date of the Charter Closing Date (the "Pre-Closing Dividend").); *see also* Answering Br. at 15 ("Delaware law required GGP to pay the Pre-Closing Dividend to any GGP stockholders who demanded appraisal.").

[132] 8 *Del. C.* § 262(k) (emphasis added).

[133] Aug. 24, 2018 BPR Form 8-K at 2.

Again, it is true that, in more traditional mergers where the deal consideration is not surgically bifurcated into separate payments, acceptance of that consideration effects a waiver of the appraisal right. We have explained as much, as has the Court of Chancery.[134] In these more typical scenarios, taking the merger consideration means that the stockholder is no longer dissenting and has accepted the terms of the transaction. But we have also explained that "the basic principle underlying the appraisal statute [is] that an investor make an *election* either to *accept* the merger consideration or to pursue an appraisal of his shares."[135] Here, qualifying GGP stockholders had no choice: they all received the Pre-Closing Dividend, and the only election they could make was whether it came in prorated cash or stock.[136] This did not constitute acceptance of the Transaction's terms and, as a result, did not operate to waive appraisal rights.

In sum, we have concluded that the Pre-Closing Dividend was merger consideration for appraisal purposes under Delaware law and that receipt of this

---

[134] *See, e.g., Berger*, 976 A.2d at 138 & n.17 ("[A] stockholder who seeks appraisal must forego all of the transactional consideration and essentially place his investment in limbo until the appraisal action is resolved.") (quoting *Turner I*, 776 A.2d at 547–48); *see also PNB Holding*, 2006 WL 2403999, at *22; *and see Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 712 (Del. Ch. 2004) (in a statutory appraisal, "the key trade-off inherent in that legislative remedy [is] the required eschewal of the merger consideration.").

[135] *Alabama By-Prod. Corp. v. Cede & Co.*, 657 A.2d 254, 262 (Del. 1995) (emphasis added) (citing *Smith v. Shell Petroleum, Inc.*, 1990 WL 186446 (Del. Ch. Nov. 26, 1990)).

[136] *See* March 9, 2022 Oral Argument at 28:15–29:10, *In re GGP, Inc. S'holder Litig.* (No. 202, 2021) https://livestream.com/accounts/5969852/events/10198573/videos/229793264 (COUNSEL FOR DEFENDANTS: "What we are telling you is that, because of the nature of this transaction, because there's cash involved, you can forgo the per share merger consideration, you can't forgo the dividend—you're going to get that—and you can seek appraisal of your shares.").

payment did not violate the eligibility requirements established by Section 262 or our doctrine. We therefore hold that the Transaction did not improperly eviscerate the appraisal rights of GGP stockholders. A properly conducted appraisal would have allowed otherwise eligible dissenters to participate, despite their receipt of the Pre-Closing Dividend, and would have valued GGP as if none of the steps of the Transaction—including the Pre-Closing Dividend, the Charter Amendments, and the Per-Share Merger Consideration—had taken place. With this established, we turn next to the Plaintiffs' claim that GGP's directors violated their fiduciary duty of disclosure when they drafted the Appraisal Rights Notice and the rest of the Proxy.

IV

The Complaint alleges that the Defendants made materially misleading disclosures regarding the GGP stockholders' appraisal rights.[137] According to the Plaintiffs, these flawed disclosures were part of an intentional effort to structure and describe the Transaction in a way that would mislead stockholders and dissuade them from dissenting from the Transaction and exercising their appraisal rights.[138]

---

[137] Compl. ¶ 303, App. to Answering Br. at B163; Opening Br. at 31, 34–42.

[138] Compl. ¶ 17, App. to Answering Br. at B22 ("The only rational inference from the false notice of appraisal rights and material omissions is that Defendants intentionally and coercively presented appraisal as a non-rational economic choice because it applied to almost none of the value of the GGP shares."); *id.* ¶ 217, App. to Answering Br. B124 ("Defendants intentionally excluded from the definition of merger consideration payments required by Section 2.03 of the Merger Agreement, which includes the Pre-Closing Dividend. The exclusion of the dividend from the definition of "merger consideration" in the Merger Agreement renders Defendants' notice of appraisal rights in the Proxy contrary to Delaware law because it falsely describes the right to appraisal.").

This objective, the Plaintiffs assert, was consistent with Brookfield's repeated demand of an appraisal-rights closing condition, which the Special Committee ultimately rejected.[139]  Accepting, as we must, all well pleaded factual allegations in the Complaint as true, and drawing all reasonable inferences in the Plaintiffs' favor, we conclude that the Plaintiffs have stated a claim that the Director Defendants violated their fiduciary duty of disclosure with Brookfield's support.

A

The fiduciary duty of disclosure is a sharpened application of corporate directors' omnipresent duties of care and loyalty that obtains when directors seek stockholder action, such as the approval of a proposed merger, asset sale, or charter amendment.[140]  In these situations, directors have "a fiduciary duty to disclose fully and fairly all material information within the board's control[.]"[141]  This specific disclosure duty is independent from a corporation's statutory obligation to notify its stockholders of their appraisal rights under Section 262.  It is also distinct from a

---

[139] Compl. ¶ 304, App. to Answering Br. at B163.

[140] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000) ("The duty of disclosure is a specific formulation of those general duties that applies when the corporation is seeking stockholder action."); *see also Orchard Enters.*, 88 A.3d at 16–17 (summarizing duty of disclosure doctrine).

[141] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992); *Appel v. Berkman*, 180 A.3d 1055, 1057 (Del. 2018) ("Precisely because Delaware law gives important effect to an informed stockholder decision, Delaware law also requires that the disclosures the board makes to stockholders contain the material facts and not describe events in a materially misleading way.") (internal citation omitted) (citing 2 Stephen A. Radin, *The Business Judgment Rule* 1715 (6th ed. 2009)).

41

director's fiduciary duty to avoid misleading partial disclosures.[142] Of course, these separate obligations may overlap, especially where, as here, corporate directors seek stockholder ratification of a proposed transaction that triggers the statutory appraisal remedy.

When a stockholder asserts a disclosure violation linked to a request for her vote, "the essential inquiry . . . is whether the alleged omission or misrepresentation is material," and the stockholder need not prove reliance, causation, or damages.[143] Information is considered material "if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote."[144] Stated another way, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the 'total mix' of information made available."[145] Notably, "the question is not whether the information would have changed the stockholder's

---

[142] *Zirn v. VLI Corp.*, 681 A2d 1050, 1056 (Del. 1996); *see also Arnold v. Society for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1280 (Del. 1994) ("[O]nce defendants traveled down the road of partial disclosure of the history leading up to the Merger and used the vague language described, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events").

[143] *Malone*, 722 A.2d at 12 ("An action for a breach of fiduciary duty arising out of disclosure violations in connection with a request for stockholder action does not include the elements of reliance, causation and actual quantifiable monetary damages.").

[144] *Louden v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 142 (Del. 1997); *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 376 (Del. Ch. 1998), *rev'd in part on other grounds sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *see also Rosenblatt v. Getty Oil Co.*, 493 A. 2d 929 (Del. 1985), in which this Court adopted the United States Supreme Court's articulation of the materiality standard in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[145] *Skeen*, 750 A.2d at 1172.

decision to accept the merger consideration, but whether 'the fact in question would have been relevant to him.'"[146]

Because the duty of disclosure sounds in the fiduciary duties of both care and loyalty, certain violations fall within the coverage of exculpatory charter provisions authorized by 8 *Del. C.* § 102(b)(7). Section 102(b)(7) allows stockholders, via a provision in the corporate charter, to eliminate or limit "the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as director[.]"[147] Critically, Section 102(b)(7) provisions may not exculpate directors for their breaches of the duty of loyalty or "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law[.]"[148]

Thus, "[a] good faith erroneous judgment as to the proper scope or content of required disclosure implicates the duty of care rather than the duty of loyalty" and may be exculpated.[149] However, "where a complaint alleges or pleads facts sufficient to support the inference that the disclosure violation was made in bad faith, knowingly or intentionally, the alleged violation implicates the duty of loyalty" and

---

[146] *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 115 (Del. 1992) (citing *Barkan v. Amsted Indus.*, 567 A.2d 1279, 1289 (Del. 1989).

[147] 8 *Del. C.* § 102(b)(7).

[148] *Id.* Two other categories also may not be exculpated: violations of 8 *Del. C.* § 174 and violations relating to "any transaction from which the director derived an improper personal benefit." *Id.*

[149] *Zirn*, 681 A.2d at 1062.

may not be exculpated.[150]  Here, GGP's charter includes a provision that exculpates directors to the fullest extent authorized by Section 102(b)(7).[151]  The Plaintiffs allege that this does not protect the Director Defendants because they intentionally misled stockholders about their appraisal rights in the Proxy.[152]

B

The Plaintiffs allege in the Complaint that the Director Defendants, aided and abetted by Brookfield, violated their fiduciary duty of disclosure by inaccurately describing the entity that would be subject to appraisal.[153]  The Plaintiffs observe that the Proxy told stockholders that their appraisal rights were limited to GGP as it was positioned after declaring the Pre-Closing Dividend and amending its charter, when in fact a properly conducted appraisal would have valued the Company before these steps were taken.[154]  The Plaintiffs allege that this disclosure was "materially

---

[150] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (Del. Ch. 1999) (Steele, VC) (citing *Zirn*, 681 A.2d at 1061–62)); *Arnold*, 650 A.2d at 1287 ("[C]laims alleging disclosure violations that do not otherwise fall within any exception are protected by Section 102(b)(7) and any certificate of incorporation provision (such as Article XIII) adopted pursuant thereto.").  Writing as a Vice Chancellor in *O'Reilly*, former Chief Justice Steele offered a helpful explanation of the pleading dynamic in duty of disclosure cases, explaining that "after *Malone*[,] knowledge is no longer an element" of a duty of disclosure claim, but "knowledge that the statement is false or misleading would be relevant to a claim to exempt directors from liability for the breach of the duty of disclosure pursuant to exculpatory charter provisions authorized by 8 *Del. C.* § 102(b)(7)." *O'Reilly*, 745 A.2d at 920 n.34.

[151] App. to Answering Br. at B3.

[152] Compl. ¶ 304, App. to Answering Br. at B163; *see also id.* ¶¶ 209– 234.

[153] *Id.* ¶ 233, App. to Answering Br. at B130.

[154] Opening Br. at 6–7, 36–42

44

misleading and incomplete."[155] They also claim that it was intentional and that the Defendants hoped to dissuade stockholders from dissenting and seeking appraisal.[156]

Contrariwise, the Defendants argue that the Proxy accurately disclosed "that GGP stockholders were entitled to seek appraisal of their *shares* in connection with the Transaction[.]"[157] The Defendants add that, to the extent the Transaction they designed implicated uncertainty in our appraisal law, they were not required to speculate and offer legal advice about how an appraisal proceeding would operate.[158]

We take up these contentions regarding the adequacy of the Director Defendants' disclosures in turn. We hold that the Proxy was materially misleading and that the defenses offered by Brookfield and the Director Defendants are without merit.

1

As previously quoted in this decision, the heart of the Appraisal Rights Notice in the Proxy explained that

---

[155] *Id.* at 42.

[156] *Id.*

[157] Answering Br. at 28 (emphasis in original); *see also* March 9, 2022 Oral Argument at 22:30–23:30, *In re GGP, Inc. S'holder Litig.* (No. 202, 2021) https://livestream.com/accounts/5969852/events/10198573/videos/229793264 (COUNSEL FOR DEFENDANTS: "[T]he GGP stockholders were entitled, pursuant to the statute and as we disclosed in the Proxy, [to] appraisal on their shares. That's what they were entitled to. It was up the appraiser—the Vice Chancellor or Chancellor—to decide how that appraisal proceeding was going to work. They were entitled to appraisal of their shares. That's exactly what the statute says, and that's what the disclosure said.").

[158] Answering Br. at 28–29.

> If the Transactions are completed, GGP common stockholders who comply exactly with the applicable requirements and procedures of Section 262 of the DGCL will be entitled to demand *appraisal of their GGP common stock and receive in lieu of the per share merger consideration a cash payment equal to the "fair value" of their GGP common stock*, as determined by the Court of Chancery, in accordance with Section 262 of the DGCL, plus interest, if any, on the amount determined to be the fair value, subject to the provisions of Section 262 of the DGCL. *Such appraised value may be greater than, the same as or less than the per share merger consideration.*[159]

Separately, the Proxy defined the "merger" as occurring after GGP's charter was amended and the Pre-Closing Dividend was declared and told the GGP stockholders that they were "entitled to exercise their appraisal rights solely in connection with the merger."[160] The fair value available in that proceeding, stockholders were told, would be "greater than, the same as or less than" the "per share merger consideration." This decision capitalizes Per-Share Merger Consideration for the reader's convenience; the Proxy defined it in lowercase as the sliver of compensation, eventually set at $0.312, that would remain after GGP declared the massive Pre-Closing Dividend.[161]

These disclosures were, in our view, confusing and misleading. As discussed above, a properly conducted appraisal would have valued GGP before the Charter

---

[159] Proxy at 335, App. to Opening Br. at A384 (emphasis added).
[160] *Id.* at 15, App. to Opening Br. at A43.
[161] *Id.* at vi, App. to Opening Br. at A22.

Amendments and the payment of the Pre-Closing Dividend and the Per-Share Merger Consideration. It was the fair value of this pre-Transaction entity that stockholders were set to part with if they consented to the Transaction, and therefore it was this fair value that the stockholders were entitled to in an appraisal. Indeed, at the second oral argument in this appeal, the Defendants acknowledged as much:

> You get an appraisal of your shares, you get your *pro rata* share in the company at the effective time of the merger, which the court would be free to decide was before any of the transaction mechanics began to happen. Before the pre-closing dividend was paid, and before the per-share merger consideration was paid. What was your *pro rata* share of the Company? That's what the statute says. *You get appraisal on your shares, and the determination is, before anything happened with respect to the merger mechanics, what was your pro rata share of the company*?[162]

The italicized portion of the above argument is a correct statement of Delaware law. The problem for the Defendants is that it is not what they disclosed in the Proxy. In contrast to this belated and qualified concession, the Proxy repeatedly decoupled the appraisal analysis from everything but the Per-Share Merger Consideration. To quote again from the Appraisal Rights Notice, stockholders were informed that the appraised fair value of GGP—a company that was being sold for $23.50-per-share—would be "greater than, the same as or less

---

[162] *See* March 9, 2022 Oral Argument at 25:15–26:10, *In re GGP, Inc. S'holder Litig.* (No. 202, 2021) https://livestream.com/accounts/5969852/events/10198573/videos/229793264 (emphasis added).

47

than the per share merger consideration" of $0.312.[163] The reason this was so, the Proxy explained separately, was that any appraisal would be "solely in connection with the merger," which would occur *after* declaration of the Pre-Closing Dividend and the amendment of GGP's charter to authorize the issuance of new types of equity.[164] It is reasonably conceivable, if not reasonably certain, that a GGP stockholder who read the Proxy would have taken it at its word and concluded that appraisal rights were limited to the fair value of GGP after payment of the Pre-Closing Dividend. Stockholders who reached this conclusion were misled.

We recognize that the Court of Chancery did not read the Proxy's appraisal disclosures as we have here. Instead, the court understood them to mean that, if

> the Preclosing Dividend plus the closing consideration [*i.e.*, the per share merger consideration of $0.312] undervalued the dissenting stockholder's shares. . .[,] the dissenting shareholder would receive an appraisal award that reflected the difference between what she had received in the Pre-Closing Dividend and the adjudicated value of her shares.[165]

Likewise, the Special Committee, in its evaluation of the benefits of the Transaction as recorded in the Proxy, considered the availability of appraisal rights and told stockholders that the fair value of GGP's shares "may be more than, less than, or the

[163] Proxy at 335, App. to Opening Br. at A363.
[164] *Id.* at 56, App. to Opening Br. at A84.
[165] *GGP*, 2021 WL 2102326, at *32.

same as the consideration to be received in the Transactions," which included the Pre-Closing Dividend.[166]

Would that it had been so disclosed in the Appraisal Rights Notice—but, as discussed, it was not. Instead, the Appraisal Rights Notice stated that a dissenting stockholder would receive not the difference between the fair value of the stockholder's shares as appraised by the court and the already received Pre-Closing Dividend, but rather a cash payment "equal to the 'fair value'" of those shares, and explicitly correlated that value to the $0.312 Per-Share Merger Consideration. In this way—and unlike the straightforward description of how an appraisal award would be determined that was offered by the Court of Chancery and, belatedly, by the Defendants at oral argument—the Proxy's description of appraisal rights was misleading.

2

Information is considered material "if there is a substantial likelihood that a reasonable stockholder would consider it important in deciding how to vote."[167] At this early stage of the proceedings, we believe that it is reasonably conceivable that the Proxy's failure to correctly identify which entity would be subject to appraisal was material to stockholders in at least two ways. First, the entity confusion created

---

[166] Proxy at 86, App. to Opening Br. at A114.
[167] *Louden*, 700 A.2d at 142.

by the Proxy left stockholders to ponder difficult questions about how GGP would be valued after declaring the Pre-Closing Dividend, which obligated the Company to pay out more than $9 billion in cash.[168] Second, it is reasonably conceivable that the Proxy's definitions of Per-Share Merger Consideration and the "merger" led some stockholders to believe that they could not qualify for appraisal at all due to the operation of Section 262(g) and its *de minimis* condition.[169]

We begin with what should be apparent by now: the Proxy told stockholders that they were entitled to an appraisal only of the GGP that remained after the Company declared the Pre-Closing Dividend and amended its charter, but this was incorrect as a matter of Delaware law. Although it may be possible to envision statements of the law that suffer from a technical inaccuracy but are not necessarily material to a stockholder's decision about how to vote, this is not one of them. We think it obvious that stockholders would have conceivably found it important to know that a properly conducted appraisal would have valued GGP before the declaration of the Pre-Closing Dividend and the execution of the Charter Amendments. Adequately informed, stockholders could have made a judgment about the value of the total consideration offered in the Transaction and their view of the fair value of GGP as a going concern. Indeed, this is the precise judgment the

---

[168] Opening Br. at 6–9, 34–42; Compl. ¶¶ 206, 225, App. to Answering Br. at B115, 128.
[169] Opening Br. at 25–27, 31; Compl. ¶ 226, App. to Answering Br. at B128

Special Committee made in recommending the Transaction.[170]  Instead, stockholders were left to guess about how an appraisal would consider the Pre-Closing Dividend and the Charter Amendments, and whether the fair value of GGP after these steps were taken—when added to the Pre-Closing Dividend—would make them whole.

Next, it is reasonably conceivable that the Proxy's defective description of appraisal rights was consequential to the stockholders' evaluation of the eligibility criteria laid out in Section 262(g).  That subsection provides, in pertinent part, that the Court of Chancery must dismiss appraisal proceedings unless the total number of dissenting shares is either more than one percent of the total amount of shares outstanding or the "value of the consideration provided in the merger . . . for such total number of [dissenting] shares exceeds $1 million[.]"[171]

At issue here is the second of Section 262(g)'s thresholds, what some call the *de minimis* condition, which provides that dissenters must represent at least $1 million in "consideration provided in the merger."  Even though the Proxy mirrored this statutory text, the Plaintiffs argue that they were misled because the Defendants defined Per-Share Merger Consideration to represent just $0.312 out of the total deal

---

[170] Proxy at 86, App. to Opening Br. at A114 (explaining that stockholders had the "opportunity to have the Court of Chancery determine the fair value of their shares of GGP common stock, which may be more than, less than, or the same as the consideration to be received in the Transactions[.]").
[171] 8 *Del. C.* § 262(g).

price of $23.50.[172] Thus, applying the Defendants' own defined terms, the Plaintiffs maintain that stockholders were left with the impression that they needed to satisfy the $1 million threshold by aggregating shares worth $0.312, rather than $23.50.

The Defendants counter this argument on three grounds. First, they claim that the Plaintiffs waived it by failing to advance it in the Court of Chancery. We disagree. In their Complaint, the Plaintiffs allege that "the misleading disclosure is material because no rational stockholder would dissent on the Buyout and perfect his appraisal rights if by doing so he only placed a *de minimis* part of GGP's supposed pre-Buyout value at issue."[173] The Complaint also asserts that "[u]nder Delaware law, the Pre-Closing Dividend would be included as part of 'the value of the consideration provided in the merger' under Section 262(g)."[174] Finally, in their briefing to the Court of Chancery, the Plaintiffs argued that "[t]he Proxy falsely disclosed (in buried, confusing form) stockholders' appraisal rights by stating that only the [Per-Share Merger Consideration], a *de minimis* portion of deal consideration, could form the basis for recovery in any appraisal proceeding."[175]

Second, and on the merits, the Defendants argue that, even if the Proxy was confusing or inaccurate, it is "speculative" whether stockholders were harmed

---

[172] Opening Br. at 27; Compl. ¶ 225–26, App. to Answering Br. at B128; *see also* App. to Opening Br. at A900.

[173] Compl. ¶ 226, App. to Answering Br. at B128.

[174] *Id.* ¶ 218, App. to Answering Br. at B125.

[175] App. to Opening Br. at A1104; *see also* App. to Opening Br. at A900 ("[S]tockholders were denied the right to appraisal for all but a *de minimis* portion of the value of their shares[.]").

because Section 262(g) allows for the aggregation of holdings and "only *0.5%* of GGP's outstanding shares would be required to reach" the $1 million *de minimis* threshold. We do not agree. While it may take speculation to conclude that the Section 262(g) threshold was factually insurmountable, it is nevertheless reasonably conceivable that individual stockholders were harmed when the Proxy misled them about the total number of shares that had to dissent in order for appraisal to be available. Put differently, by dramatically overstating the number of shares that Section 262(g) required for appraisal to be available, the Proxy conceivably dissuaded stockholders from seriously considering appraisal at all.[176]

Third, at oral argument, the Defendants suggested that the Proxy was not misleading at all because stockholders could have disregarded the defined terms and come to the independent conclusion that "consideration provided in the merger" included *both* the Pre-Closing Dividend and the Per-Share Merger Consideration, As the Defendants argued:[177]

---

[176] In their Answering Brief, the Defendants offer that "GGP received *multiple* appraisal demands in connection with the Transaction—including by clients represented by signatories to Plaintiffs' Opening Brief in this appeal." Answering Br. at 23 n.59 (emphasis in original). At this early stage of the case, it is not clear from the pre-discovery record how many demands were made and how they were disposed of—be it by settlement, Section 262(g), loss of interest, or otherwise.

[177] *See* March 9, 2022 Oral Argument at 39:37–41:07, *In re GGP, Inc. S'holder Litig.* (No. 202, 2021) https://livestream.com/accounts/5969852/events/10198573/videos/229793264. Counsel also argued that "'the value of the consideration provided in the merger,' . . . could reasonably conceivably be read, and should be read, as including both the pre-closing dividend and the $0.312." Whether or not such a reading is viable, at this stage of the case we "do not affirm a dismissal unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Central Mortg.*, 27 A.3d at 535 (citing *Savor*, 812 A.2d at 896–97).

I think the language in 262(g) talks about, and you quoted it Your Honor, 'the value of the merger consideration,' which one could fairly assume includes both the pre-closing dividend and the $0.312, and why would someone be dissuaded under those circumstances from seeking appraisal?

THE COURT: Well, because you're telling us the merger consideration could include both, but the proxy defines it as excluding the dividend.

As discussed at length, the Proxy persistently separated the Pre-Closing Dividend and the Per-Share Merger Consideration. Stockholders were told that the Pre-Closing Dividend would be declared before the "merger"[178] and that appraisal rights were available "solely in connection with the merger" and the $0.312 in Per-Share Merger Consideration that came with it.[179] Given this, stockholders could hardly have been expected to conclude that they could satisfy Section 262(g) by adding the two types of consideration together.

We therefore hold that the Proxy's erroneous statements about which entity would be appraised—the GGP before the Transaction or the GGP after the Charter Amendments and the payment of the Pre-Closing Dividend—were material because they deprived stockholders of necessary information about the fair value available in an appraisal proceeding and misled stockholders about the operation of Section 262(g).

---

[178] Proxy at 56, App. to Opening Br. at A84.
[179] *Id.* at 15, App. to Opening Br. at A43.

As an overarching defense to the Plaintiffs' duty of disclosure claim, the Defendants argue that that their disclosure duties did not require them to explain to stockholders the implications of the transaction structure on their appraisal rights "much less speculate about how a court might decide hypothetical legal issues."[180] Tellingly, the Defendants maintain that the "hypothetical legal issue" requiring speculation is how the Pre-Closing Dividend might be treated in an appraisal proceeding."[181] We note here that the conceded presence of a "hypothetical legal issue" supports our conclusion that the Proxy disclosure left stockholders in the dark about the true nature of their appraisal rights. It also reinforces the inference, mentioned previously, that the Defendants were poised to press for a narrow, post-dividend valuation in the event that a sufficient number of GGP stockholders pursued an appraisal remedy.[182]

But, from a disclosure perspective, the Defendants' approach suffers from a more fundamental flaw: the Appraisal Rights Notice—read with the Proxy's defined terms—*did* offer stockholders advice about how an appraisal proceeding would operate. It did so by applying the definition of the residual $0.312 payment as the

---

[180] Answering Br. at 3.

[181] *Id*. at 28. ("Plaintiffs' argument that the Proxy misled GGP stockholders conflates the requirement to disclose the *right* to an appraisal of *shares*, which the Proxy accurately did, with a desire for disclosure of (or advice on) how the Pre-Closing Dividend might affect a hypothetical appraisal proceeding.") (emphasis in original).

[182] *See* note 109, *supra*.

"per share merger consideration" and, as previously discussed, closely linking the court's "fair value" determination in a hypothetical appraisal proceeding to the residue of GGP represented by that limited consideration. Thus, whether or not the Defendants were originally required to tell stockholders how the complex Transaction they designed would affect their appraisal rights, once the Defendants attempted to offer such an explanation, they were required to be correct and complete.[183] In other words, they had to tell the stockholders that a properly conducted appraisal would determine the value of GGP before the payment of the Pre-Closing Dividend and the execution of the Charter Amendments. Because this did not happen, the Defendants are left to "face the consequences of a breach of fiduciary duty."[184]

4

GGP's charter contains a Section 102(b)(7) exculpatory provision.[185] The Plaintiffs argue that it does not apply here because the Director Defendants intended to mislead stockholders about the true nature of their appraisal rights.[186] At this early stage of this case, we "do not affirm a dismissal unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[187] With

---

[183] *Arnold*, 65- A.2d at 1280.
[184] *Disney*, 731 A.2d at 376.
[185] App. to Answering Br. at B3.
[186] *See* Compl. ¶¶ 302–307, App. to Answering Br. at B163–64; Reply Br. at 16–127.
[187] *Central Mortg.*, 27 A.3d at 535 (citing *Savor*, 812 A.2d at 896–97).

this standard in mind, we conclude that it is reasonably conceivable that the Director Defendants, aided and abetted by Brookfield, committed a violation of the fiduciary duty of disclosure that may not be exculpated.

The Complaint alleges that the Director Defendants, with Brookfield's support, "breached their fiduciary duty of loyalty by failing to provide GGP stockholders with a fair summary of their appraisal rights and [not] disclosing all material information relevant to GGP stockholders" and their decision whether to support the Transaction.[188] The Plaintiffs also claim that this "conduct was intentional, a contrived scheme to dissuade Class members from exercising appraisal rights that BPY was actively trying to limit in negotiations with the Special Committee."[189] While we do not accept unsupported allegations as true even at the pleading stage—after all, stockholder plaintiffs often have the ability to draw on public documents and Section 220 books and records in order to fill out their complaints—we believe that the Plaintiffs have met their initial burden for at least two reasons.

First, the Complaint observes that Brookfield demanded an appraisal-rights closing condition early in its negotiations with the Special Committee.[190] As

---

[188] Compl. ¶ 303, App. to Opening Br. at B163.

[189] *Id.* ¶ 304, App. to Answering Br. at B163; *see also id.* ¶¶ 209–234; *see also* Opening Br. at 33 ("Brookfield's repeated insistence on a condition permitting it to withdraw if there were significant appraisal demands permits an inference that substituting a structure placing 98.5% of the consideration in the Dividend was an alternate way of limiting appraisal demands.").

[190] Compl. ¶ 224, 304, App. to Answering Br. at B128, 163.

discussed above, an appraisal-rights closing condition allows the purchaser to terminate the transaction if a specified number of shares demands appraisal.[191] The Proxy, which the Court of Chancery determined was integral to the Complaint and therefore incorporated by reference, supports the Complaint's allegation.[192] It indicates that Brookfield twice demanded an appraisal-rights closing condition and was rejected by the Special Committee on both occasions.[193] After these rejections, the parties agreed to bifurcate the deal consideration into two pieces, the large Pre-Closing Dividend and the tiny Per-Share Merger Consideration. In our view, it is reasonably conceivable that the Defendants settled on this structure and the related Proxy disclosure as another method of limiting Brookfield's exposure to appraisal demands.

Second, and relatedly, the Defendants have not identified an alternative justification for the structure they chose. Although it is generally true that corporate directors do not have to justify each element of a proposed transaction structure when they communicate with stockholders, in this case the Plaintiffs have argued, with citation to a Proxy written by the Defendants, that Brookfield's purchase of GGP was designed and disclosed with the explicit aim of curtailing the statutory appraisal rights that were triggered by the Transaction's cash consideration. Facing this

---

[191] *See* note 23, *supra.*
[192] *GGP*, 2021 WL 2102326, at *3 & n.6.
[193] *See* Proxy at 73–76, App. to Opening Br. at A101–104.

argument in litigation, the Defendants have had every opportunity to explain to this Court why the negative inferences proposed by the Plaintiffs are not reasonably conceivable. Instead, the Defendants on appeal offer a blanket and summary denial, maintaining that "[n]o facts are alleged in the Complaint suggesting that the GGP directors' conduct concerning appraisal rights was 'deliberate, intentional, unlawful, and in bad faith,' as Plaintiffs contend[.]"[194] At this stage, this is not enough to defeat the Plaintiffs' well-pleaded claim that the Defendants committed a knowing violation of the fiduciary duty of disclosure.

## V

The judgment of the Court of Chancery dismissing Counts I, II, IV, and V of the Complaint is affirmed. The judgment of the Court of Chancery dismissing Counts III and VI of the Complaint is reversed, and this matter is remanded for further proceedings in accordance with this opinion.

---

[194] Answering Br. at 32–33.

59

**MONTGOMERY-REEVES**, Justice, concurring in part, dissenting in part, joined by **VAUGHN**, Justice:

We agree with the Majority's decision to affirm the dismissal of the Plaintiffs' claim that the Transaction structure deprived stockholders of their right to seek appraisal for two reasons. First, we agree that the Pre-Closing Dividend is merger consideration. Second, we agree that stockholders can accept the Pre-Closing Dividend and still seek appraisal. However, we depart from our colleagues in the majority on their interpretation of the disclosure of appraisal rights. We do not believe it is reasonably conceivable that the disclosure is misleading. We also would hold that the Plaintiffs waived the Section 262(g) arguments presented on appeal. Thus, we would affirm the Court of Chancery's decision.

The Plaintiffs argue that if the Pre-Closing Dividend is merger consideration for appraisal purposes, they state a reasonably conceivable claim that the notice of appraisal in the Proxy is misleading.[195] The Plaintiffs contend that the Proxy did not accurately inform stockholders of the appraisal rights that were available because "[i]t told them that appraisal rights were limited to the Merger (excluding the Pre-Closing Dividend) and that an appraisal proceeding would only determine whether fair value post-Dividend was greater than, the same as or less than the $.0312 [sic]

---

[195] Opening Br. 34-42.

merger consideration."[196]  In general, the Plaintiffs take issue with the Proxy because it

> identifies the $0.312 in cash received in the merger as "the per share merger consideration" and specifies that stockholders perfecting appraisal rights would "receive in lieu of the per share merger consideration a cash payment equal to the fair value of their GGP common stock," which might be "greater than, the same as or less than the per share merger consideration."[197]

In other words, the Plaintiffs believe that the Proxy is misleading because it "expressly, directly and repeatedly said" "that appraisal would be limited to the [Per-Share Merger Consideration]."[198]

Plaintiffs further allege that "in light of *Crawford*, the notice was not an accurate statement of the available appraisal rights" because "under *Crawford* the Dividend might be part of the Merger."[199]  And because, according to the Plaintiffs, Delaware law requires corporations to provide notice of the scope of an appraisal proceeding, the Proxy's failure to mention that the Dividend would be merger consideration for appraisal purposes renders it incomplete and misleading.[200]

---

[196] *Id.* at 36.
[197] *Id.* at 37.
[198] *Id.* at 39.
[199] *Id.* at 40, 41.
[200] *Id.* at 40-42.

## A. Disclosure Obligations Under Delaware Law

"[D]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[201] "The duty of disclosure is a judicially imposed fiduciary duty"[202] that "serves the ultimate goal of informed stockholder decision making."[203] "The duty of disclosure is, and always has been, a specific application of the general fiduciary duty owed by directors"[204] and is "[a] combination of the fiduciary duties of care and loyalty."[205] "The Delaware fiduciary duty of disclosure is not a full-blown disclosure regime like the one that exists under federal law . . . ."[206]

"Directors of Delaware corporations have a fiduciary duty to shareholders to exercise due care, good faith and loyalty whenever they communicate publicly or directly with shareholders about the corporation's affairs."[207] "When stockholder action is requested, directors are required to provide shareholders with all information that is material to the action being requested and 'to provide a balanced, truthful account of all matters disclosed in the communications with shareholders.'"[208]

---

[201] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[202] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 537 (Del. 1996).

[203] *Clements v. Rogers*, 790 A.2d 1222, 1236 (Del. Ch. 2001).

[204] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

[205] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995).

[206] *Id.*

[207] *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223 (Del. 1999).

[208] *Id.* (citing *Malone*, 722 A.2d at 12).

"A board can breach its duty of disclosure under Delaware law in a number of ways—by making a false statement, by omitting a material fact, or by making partial disclosure that is materially misleading."[209] "The last of these occurs where a board makes a required or even non-obligatory pronouncement on a subject that is incomplete and by which shareholders are materially misled."[210] Omitted facts are considered material "if there is a substantial likelihood that a reasonable stockholder would consider [them] important in deciding how to vote."[211] Stated another way, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the 'total mix' of information made available."[212] Therefore, the primary question is whether the alleged misrepresentation is material with respect to the stockholder action being sought.[213] Notably, "the question is not whether the information would have changed the stockholder's decision to accept the merger consideration, but whether 'the fact in question would have been relevant to him.'"[214]

---

[209] *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 376 (Del. Ch. 1998).
[210] *Id.*
[211] *Louden v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 142 (Del. 1997).
[212] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1172 (Del. 2000).
[213] *Malone*, 722 A.2d at 12.
[214] *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 115 (Del. 1992) (citing *Barkan v. Amsted Indus.*, 567 A.2d 1279, 1289 (Del. 1989).

"When determining whether there has been a disclosure violation, a proxy statement should be read as a whole."[215] Thus, it is not dispositive that a sentence or particular characterization read in isolation may be misleading if the misleading nature of that sentence or characterization cannot be sustained in light of the entire proxy statement.[216] This concept is grounded in the fact that, "in order to be material, the omitted fact must contribute meaningfully to the 'total mix' of information available to the stockholders."[217]

Under Delaware case law, the corporation's disclosure of appraisal rights must include all material information to allow stockholders to determine whether to accept the merger consideration or seek appraisal.[218] Thus, the disclosure of

---

[215] *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *18 (Del. Ch. Dec. 11, 2017); *see In re MONY Grp. Inc. S'holder Litig.*, 852 A.2d 9, 31 (Del. Ch. 2004) (noting that a proxy statement should be read fully when determining whether a proxy statement is misleading); *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *1 (Del. Ch. Dec. 18, 2009) ("So long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment.").

[216] *See Crane*, 2017 WL 7053964, at *18 ("When the Proxy is read in full, I do not believe the 'sunset' characterization was materially misleading because the Proxy makes clear that the Conflicts Committee and the Board believed it was important to Yield's success that NRG continue to be Yield's controlling stockholder and that NRG would not be in danger of losing control any time soon after the Reclassification.").

[217] *Ehlen v. Conceptus, Inc.*, 2013 WL 2285577, at *2 (Del. Ch. May 24, 2013).

[218] *Shell*, 606 A.2d at 114 ("As the majority shareholder, [the parent company] bears the burden of showing complete disclosure of all material facts relevant to a minority shareholders' decision whether to accept the short-form merger consideration or seek an appraisal."); *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 846 (Del. 1987) ("Nonetheless, the defendants retain the burden of proving complete disclosure of all material facts relevant to the merger vote."); *see Skeen*, 750 A.2d at 1174 ("We agree that a stockholder deciding whether to seek appraisal should be given financial information about the company that will be material to that decision. In this case, however, the basic financial data were disclosed and appellants failed to allege any facts indicating that the omitted information was material.").

appraisal rights must comply with Section 262's notice obligations and include all material information (i.e., that which meaningfully adds to the total mix of information a stockholder takes into account when deciding whether to accept the merger consideration or seek appraisal).

**B.     The Plaintiffs Fail to State a Claim That the Proxy Is False or Misleading**

The following passage from the Proxy lies at the heart of this appeal:

> If the Transactions are completed, GGP common stockholders who comply exactly with the applicable requirements and procedures of Section 262 of the DGCL will be entitled to demand appraisal of their shares of the GGP common stock (i.e., the dissenting shares) and receive in lieu of the per share merger consideration a cash payment equal to the "fair value" of their GGP common stock, as determined by the Court of Chancery, in accordance with Section 262 of the DGCL, plus interest, if any, on the amount determined to be the fair value, subject to the provisions of Section 262 of the DGCL. Such appraised value may be greater than, the same as or less than the per share merger consideration.[219]

The Plaintiffs contend that the Proxy directly states that GGP would be appraised after the payment of the Pre-Closing Dividend because the Proxy uses the defined term "per share merger consideration."[220] The majority agrees and concludes that because the Proxy defines the "merger" as occurring after the Pre-Closing Dividend was declared, and because the Proxy states that GGP stockholders

---

[219] App. to the Opening Br. A363 (hereinafter "A__").
[220] Opening Br. at 37-39.

are "entitled to exercise their appraisal rights solely in connection with the *merger*," it is reasonably conceivable that a stockholder would conclude that GGP would be appraised after the payment of the Pre-Closing Dividend. We disagree.

### 1. The Proxy's use of the term "per share merger consideration"

The Plaintiffs take issue with the Proxy's use of the defined term "per share merger consideration" in the sentences quoted above.[221] In particular, the Plaintiffs argue that the definition of per share merger consideration, which excludes the Pre-Closing Dividend, is misleading because it implies that any appraisal proceeding would value the corporation after the payment of the Pre-Closing Dividend. We disagree and would conclude that the Proxy's use of that definition simply described the mechanics of a potential appraisal proceeding.

As explained in the majority opinion, although stockholders must forgo the merger consideration to demand appraisal, Section 262(k) entitles all stockholders of record (even those that demand appraisal) to dividends payable before the effective date of the merger. Because the Pre-Closing Dividend was a dividend payable prior to the effective date of the Transaction, GGP stockholders who demanded appraisal were entitled to that payment. And because the Per-Share Merger Consideration did not take the form of a dividend payable prior to the

---

[221] *Id.*

66

effective date of the Transaction, stockholders were required to forgo the Per-Share Merger Consideration to perfect their appraisal right. Thus, under the mechanics of an appraisal proceeding, any payment required by the Court of Chancery would be made in place of only the Per-Share Merger Consideration because Section 262(k) entitles the stockholder to the Pre-Closing Dividend. In other words, the Proxy's use of "per share merger consideration" accurately reflects that the Per-Share Merger Consideration, and not the Pre-Closing Dividend, would be the only consideration at risk in an appraisal action.

Thus, we do not believe that Plaintiffs stated a reasonably conceivable claim that the Proxy's use of "per share merger consideration" was misleading.

### 2. The Proxy's use of the term "merger"

The majority holds that it is reasonably conceivable that a stockholder could read the Proxy and conclude that any appraisal proceeding would value the Company after payment of the Pre-Closing Dividend because the Proxy states that GGP stockholders are "entitled to exercise their appraisal rights solely in connection with the *merger*."[222] And because the Proxy defines the merger as occurring after the declaration of the Pre-Closing Dividend, a stockholder could reasonably read the Proxy as stating that appraisal would be limited to the approximately one and a half

---

[222] A43 (emphasis added).

percent of the value of the company left at the time it paid the Per-Share Merger Consideration. We disagree.

In our view, the phrase "in connection with" qualifies the word "merger." There is nothing more connected to the Transaction than the Pre-Closing Dividend— after all, it makes up 98.5% of the Transaction's consideration, is conditioned on the Transaction's approval, and is funded by the buyer. That the Pre-Closing Dividend was connected to the merger is disclosed throughout the entirety of the Proxy:

- Therefore, as a result of receiving the pre-closing dividend and the per share merger consideration, unaffiliated GGP common stockholders . . . will be entitled to receive, for each share of issued and outstanding GGP common stock and each share of GGP common stock deemed held, and subject to proration, *total consideration of up to $23.50* in cash or one (1) share of class A stock, at the election of such GGP common stockholders (with deemed stockholders being deemed to have elected cash).[223]
- Q: How do I calculate the value of the *total consideration* received in connection with the Transactions?
  A: Unaffiliated GGP common stockholders . . . will be entitled to receive, for each share of issue and outstanding GGP common stock, and subject to proration, *total consideration* of up to $23.50 in cash or one (1) share of class A stock, at the election of such GGP common stockholders (with deemed stockholders being deemed to have elected cash).[224]
- If the Transactions, including the merger, are not completed, GGP common stockholders will not receive *any consideration* in connection with the Transactions.[225]

---

[223] A34 (emphasis added).
[224] A36 (emphasis added).
[225] A47 (emphasis added).

- [E]quity award average cash amount is the value (rounded to the nearest $0.001) of the *aggregate cash consideration* that would be paid in respect of each share of GGP common stock . . . in connection with (i) *the pre-closing dividend*, assuming that every share makes a cash election and the form of consideration is prorated in accordance with the merger agreement, and (ii) *the per share merger consideration*.[226]

- At a meeting of the special committee held on March 26, 2018, Goldman Sachs & Co. LLC, which we refer to as Goldman Sachs, rendered to the special committee its oral opinion, subsequently confirmed in writing, to the effect that, as of that date, and based upon and subject to the factors and assumptions set forth in Goldman Sachs' written opinion, *the aggregate amount of the pre-closing dividend in the form of cash and the shares of class A stock . . . and merger consideration, which we refer to collectively as the aggregate consideration*, to be paid to GGP common stockholders, pursuant to the merger agreement was fair from a financial point of view to such holders.[227]

- As a result, the BPY general partner board revised its initial offer that BPY publicly announced on November 13, 2017 to: (i) increase the cash consideration from $23.00 to $23.50 per share of the GGP common stock; (ii) *increase the aggregate cash consideration by $1.85 billion from $7.4 billion to $9.25 billion . . . .*[228]

- [E]ach of the Parent parties and the Brookfield filing persons believes that the Transactions are substantively and procedurally fair to unaffiliated GGP common stockholders based on its consideration of the following factors, among others: *the consideration per share of GGP common stock of up to $23.50 in cash* or one (1) share of class A stock or one BPY unit, subject to proration, and

---

[226] A54, 239 (emphasis added).
[227] A57-58 (emphasis added).
[228] A147 (emphasis added).

the other terms and conditions of the merger agreement . . . .[229]

- [I]n no event shall the Company be obligated to consummate the Charter Closing unless the Escrow Agent has confirmed to the Company the receipt of an amount at least equal to the sum of (i) the Total Cash Amount . . . .[230]
    - o 'Total Cash Amount' shall mean $9,250,000,000 less (i) the Partnership Common Unit Cash Amount, less (ii) the Partnership LTIP Unit Cash Amount, less (iii) the Total Restricted Stock Cash Consideration.[231]

And "[w]hen determining whether there has been a disclosure violation, a proxy statement should be read as a whole."[232]

Similarly, in the same paragraph as the first sentence at issue, the notice of appraisal in the Proxy states that "GGP common stockholders should note . . . the opinion of Goldman Sachs as to the fairness, from a financial point of view, of the consideration payable in a sale transaction, such as the merger consideration . . . ."[233] In other words, the Proxy's notice of appraisal references Goldman Sachs' opinion as to the fairness of the Transaction value; that opinion concludes that *the Pre-Closing Dividend plus the Per-Share Merger Consideration is a fair price*.[234] Thus,

---

[229] A150 (emphasis added).

[230] A398-99.

[231] A393.

[232] *Crane*, 2017 WL 7053964, at *18; *see In re MONY Grp. Inc. S'holder Litig.*, 852 A.2d at 31 (noting that a proxy statement should be read fully when determining whether a proxy statement is misleading); *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *1 ("So long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment.").

[233] A363.

[234] A57-58.

the Goldman Sachs opinion further confirms that the Pre-Closing Dividend is connected to the merger.

For these reasons, we do not think it is reasonably conceivable that a stockholder would read the entirety of the Proxy and conclude that the Pre-Closing Dividend was not declared "in connection with" the merger.

### 3. The Proxy's Discussion of the Consideration of the Pre-Closing Dividend in an Appraisal Action

We also disagree with the appellant and the majority for an additional reason. In our opinion, it is not reasonably conceivable that a stockholder would read the Proxy, the Agreement, or the statute and conclude that the Company's value for appraisal purposes would be determined after payment of the Pre-Closing Dividend.

Section 262(h) instructs the Court of Chancery "to determine the fair value of the shares *exclusive of any element of value arising from the accomplishment or expectation of the merger*."[235] The Court has held that in an appraisal action, while "the fair value determination must be measured by the 'operative reality' of the corporation at the time of the merger," "the court should first envisage the entire *pre-merger company* as a 'going concern,' as a standalone entity, and assess its value as such" without considering any elements of value (positive or negative) arising from

---

[235] 8 *Del. C.* § 262(h).

the merger.[236]   In other words, in an appraisal action the court must value the company *as it would have been had the merger never occurred*.[237]

Traditionally, this has explained why synergies and other elements of value arising from the merging of corporations should not be considered in an appraisal proceeding.  Elements of value arising from the expectation of the merger should be backed out of an appraisal proceeding because that value would not arise had the merger never occurred.  But there is nothing more representative of "value arising from the accomplishment or expectation of the merger" than the merger consideration itself—the value of the transaction at issue.  As the Court of Chancery aptly noted in *In re Dollar Thrifty Shareholder Litigation*, where the use of a $200 million dividend in a merger gave rise to questions regarding the reasonableness of the merger's termination fee, the "*value* of the Merger . . . is *logically quantified* as the amount of consideration flowing into [the] shareholders' pockets."[238]  In other words, under the statute, which was attached to the notice of appraisal, the Court of Chancery would value GGP as if the Pre-Closing Dividend had not been paid because value arising from the merger—here, the payment of the Pre-Closing

[236] *Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3, 17 (Del. 2020); *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 20 (Del. 2017) (emphasis added); 8 *Del. C.* § 262(h).
[237] *See id.*
[238] 14 A.3d 573, 613 (Del. Ch. 2010) (emphasis added).

Dividend to GGP[239] and then to its stockholders—would not be part of the corporation as a going concern had the merger never occurred.

Notably, the Plaintiffs agree with this conclusion in their brief, stating, "if, as in *Crawford*, the Dividend was part of the Merger, *GGP's operative reality would not include the Dividend and fair value would be based on GGP's pre-Dividend value*."[240]

Moreover, that the Court of Chancery's determination of fair value would exclude any element of value arising from the accomplishment or expectation of the merger was repeated three times in the appraisal notice of the Proxy:

- [H]olders of record of GGP common stock . . . will be entitled to have their GGP common stock appraised by the Court of Chancery and to receive in lieu of the per share merger consideration, a cash payment equal to the "fair value" of such shares, *exclusive of any element of value arising from the accomplishment or expectation of the merger* . . . .[241]
- After determining the stockholders entitled to appraisal, the Court of Chancery will appraise the "fair value" of the GGP common stock, *exclusive of any element of value arising from the accomplishment or expectation of the merger* . . . .[242]
- Section 262 of the DGCL provides that fair value is to be "*exclusive of any element of value arising from the accomplishment or expectation of the merger.*"[243]

---

[239] A12, 31 ("(d) the amount designated by BPY to GGP that constitutes that aggregate amount of cash that GGP will pay as the pre-closing dividend . . . .").

[240] Opening Br. 23.

[241] A363 (emphasis added).

[242] A366 (emphasis added).

[243] *Id.* (emphasis added).

It is not reasonable to read the plain language of the Proxy or the statute[244] and assume that "*any* element of value arising from the accomplishment or expectation of the merger" would somehow exclude the Pre-Closing Dividend, which, as the Plaintiffs note multiple times, makes up 98.5 percent of the Transaction's value.[245] The use of the word "any" in this context means "each" or "every." Thus, the plain language of the Proxy and statute render unreasonable any reading that the Pre-Closing Dividend was not included in the definition of value for appraisal purposes, which means the appraisal action would value the corporation as if the Pre-Closing Dividend was not paid.

Moreover, we note that in the Plaintiffs' first argument on appeal, they convincingly argue that the Pre-Closing Dividend is merger consideration for purposes of an appraisal, pointing to at least two portions of the Proxy that support their stance.[246] The Plaintiffs cannot have it both ways. They cannot seriously allege in the first argument that the Proxy makes clear that the Pre-Closing Dividend is merger consideration but contend in the second argument that the Proxy misleads

---

[244] The Proxy states in capital letters, that the summary is "NOT A COMPLETE STATEMENT OF THE LAW PERTAINING TO APPRAISAL RIGHTS UNDER SECTION 262 OF THE DGCL AND IS QUALIFIED IN ITS ENTIRETY BY THE FULL TEXT OF SECTION 262 . . . ." A363. There, in Section 262(h) the stockholders would find, yet again, that the Court of Chancery cannot consider value arising from the expectation of accomplishment of the merger in its appraisal of GGP.

[245] A363; 8 *Del. C.* § 262(h) (emphasis added).

[246] *See* Opening Br. 20-21 ("The Proxy confirms the interrelationship of the Dividend and the merger consideration.").

stockholders into concluding that the Pre-Closing Dividend is not connected to the merger for appraisal purposes.

When the Proxy is read in full, the sentences at issue are not misleading because the whole of the Proxy makes clear that GGP would be valued as if the Pre-Closing Dividend had not been paid. As such, it is not reasonable for a stockholder to conclude that an appraisal action would value the corporation after the distribution of the Pre-Closing Dividend.

Thus, we would affirm the Court of Chancery's holding that the Plaintiffs did not state a reasonably conceivable claim that the Proxy violated Section 262 or Delaware disclosure obligations.

## C.  The Plaintiffs Waived Their *De Minimis* Argument

Finally, the Plaintiffs contend, and the majority opinion concludes, that it is reasonably conceivable that the Proxy's definitions of Per-Share Merger Consideration and the "merger" led some stockholders to believe that they could not qualify for appraisal at all due to Section 262(g)'s *de minimis* condition.

The majority concludes that this argument is not waived because the complaint states, "[T]he misleading disclosure is material because no rational stockholder would dissent on the Buyout and perfect his appraisal rights if by doing so he only placed a *de minimis* part of GGP's supposed pre-Buyout value at issue."[247]

---

[247] App. to Answering Br. B128.

The majority also relies on the following sentence from the Plaintiffs' brief below: "The Proxy falsely disclosed (in buried, confusing form) stockholders' appraisal rights by stating that only the [Per-Share Merger Consideration], a *de minimis* portion of deal consideration, could form the basis for recovery in any appraisal proceeding."[248] We disagree.

On appeal, the Plaintiffs argue that the Transaction's structure effectively eliminated appraisal rights because the Pre-Closing Dividend was too small for most stockholders to satisfy Section 262(g)'s *de minimis* requirement. In the complaint, the Plaintiffs argue that stockholders likely would not seek appraisal because only a *de minimis* portion of the consideration would be at issue in an appraisal proceeding. That is, the Plaintiffs alleged that stockholders were dissuaded from seeking appraisal because the small, *de minimis* amount of money that would have been at stake in an appraisal proceeding—the Per-Share Merger Consideration—rendered appraisal futile. While we acknowledge that both statements use the term *de minimis*, they convey separate concepts. Their argument on appeal relates to whether GGP stockholders could meet Section 262(g)'s *de minimis* exception. Their argument below states only that appraisal would be limited to the small (*de minimis*) Per-Share Merger Consideration. It cannot be enough that a plaintiff merely uses the same phrase—a plaintiff must also make the same argument. Thus, we would

---

[248] A1094.

hold that under Supreme Court Rule 8, the Plaintiffs waived the *de minimis* argument made on appeal.

In sum, we would hold that the Proxy was not misleading for three reasons: (1) the Proxy's use of the term "per-share merger consideration" in the appraisal notice tells the stockholders what is at risk in an appraisal proceeding; (2) the Proxy's use of the term "merger" is qualified by the phrase "in connection with," and the entirety of the Proxy makes clear that the Pre-Closing Dividend is connected to the merger; and (3) any appraisal proceeding would exclude any value (positive or negative) arising from the Transaction and the Pre-Closing Dividend is value arising from the Transaction. We would also hold that the Plaintiffs waived the *de minimis* argument they made on appeal.

For these reasons, we respectfully dissent.